**Richard M. CHUDACOFF, M.D., Plaintiff,**

v.

**UNIVERSITY MEDICAL CENTER OF SOUTHERN NEVADA, a political subdivision of Clark County, State of Nevada, County Commissioners Bruce L. Woodbury, Tom Collins, Chip Maxfield, Lawrence Weekly, Chris Giunchigliani, Susan Brager, and Rory Reid, Kathleen Silver, an individual, The Medical and Dental Staff of The University Medical Center of Southern Nevada, an independent subdivision of University Medical Center of Southern Nevada, John Ellerton, M.D., an individual, Marvin J. Bernstein, M.D., an individual, Dale Carrison, M.D., an individual, Donald Roberts, M.D., an individual, DOE Defendants 1 through X, inclusive; and Roe Corporations, A through Z, inclusive, Defendants.**

No. 2:08–CV–863–ECR–RJJ.

United States District Court, D. Nevada.

April 14, 2009.

Jacob L. Hafter, Law Office of Jacob Hafter & Associates, Las Vegas, NV, for Plaintiff.

Lynn M. Hansen, Jimmerson Hansen, P.C., Kim Irene Mandelbaum, Michelle R. Schwarz, Mandelbaum, Schwarz, Ellerton & McBride, Marie Ellerton, Cotkin, Collins & Ginsburg, Las Vegas, NV, for Defendants.

### AMENDED ORDER

EDWARD C. REED, JR., District Judge.

This case arises out the suspension of a physician's medical staff privileges with University Medical Center of Southern Nevada. Two motions are presently pending before the Court.

First is the plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (# 85), which was filed on January 9, 2009. The Court denied (# 87) the motion (# 85) to the extent that it sought a TRO and stated that it would treat the motion (# 85) solely as one for preliminary injunction. Some, but not all, of the defendants filed an Opposition (# 92) to the motion (# 85) on January 26, 2009. The plaintiff filed a Reply (# 99) on January 30, 2009.

Next is the plaintiff's Motion for Partial Summary Judgment (# 86), which the plaintiff also filed on January 9, 2009. Again, some of the defendants filed an Opposition (# 93) to the motion on January 26, 2009. This time, however, the remaining defendants filed a joinder (# 94) to the opposition (# 93). The plaintiff filed a Reply (# 97) on January 28, 2009.

On April 8, 2009, we granted the motion for partial summary judgment and denied the motion for preliminary injunction. We now issue this amended order, which replaces our order of April 8, 2009, to explain our decision further.

### I. Factual Background

Plaintiff Dr. Richard Chudacoff (or "Chudacoff"), a physician who specializes in the practice of obstetrics and gynecology, had medical privileges to work at several local hospitals in the Las Vegas area, including University Medical Center of Southern Nevada (or "UMC"). In 2007, Chudacoff was appointed to the position of Assistant Professor with the University of Nevada School of Medicine, and on December 20, 2007, Chudacoff was granted staff privileges at UMC in the obstetrics and gynecology department. Chudacoff worked at UMC from December 20, 2007, through May 28, 2008.

Part of Chudacoff's work involved overseeing resident physicians. Chudacoff thought that the residents' skills were substantially below the skill level of other residents that he had supervised previously in his career at a different medical school. On April 16, 2008, Chudacoff wrote an email to Paul G. Stumpf, M.D., Professor and Chair of Obstetrics and Gynecology at the University of Nevada School of Medicine, regarding his concerns over the skills of the residents. Chudacoff made several recommendations for improving the quality of care that the residents provided.

On May 28, 2008, Chudacoff received a letter from Defendant John Ellerton, M.D., Chief of Staff at UMC, in which Ellerton told Chudacoff that the Medical Executive Committee (or "MEC") had "suspended, altered or modified his medical staff privileges." In addition, the MEC ordered Chudacoff to undergo drug testing and physical and mental examinations. Chudacoff alleges that this suspension came from out of the blue; he had no knowledge that the MEC was considering altering or changing his privileges.

The May 28 letter advised Chudacoff that he was entitled to a Fair Hearing;

however, he was not advised of the allegations presented against him. On June 2, 2008, Chudacoff's insurance counsel requested a Fair Hearing. On June 10, 2008, Chudacoff received a letter from University of Nevada–Reno President Milton Glick informing Chudacoff that his employment with the University of Nevada School of Medicine had been terminated as a result of the suspension of his clinical privileges.

On June 16, 2008, certain defendants filed a report with the National Practitioner Data Bank (or "NPDB") stating that Chudacoff's privileges had been suspended indefinitely for substandard or inadequate care and substandard or inadequate skill level. The report to the National Practitioner Data Bank cites four cases where Chudacoff caused "serious operative complications during gynecological surgery," one incident where Chudacoff failed to respond to a medical emergency, and numerous complaints of disruptive behavior. On June 18 and 20, 2008, other health care facilities notified Chudacoff that his privileges had been denied or revoked because of the information listed on the NPDB. On June 23, 2008, Chudacoff received the medical record numbers for the patients involved in the NPDB report.

Having received no response to his request for a Fair Hearing, on July 2, 2008, Chudacoff filed the original complaint in this case. On July 18, 2008, Chudacoff was informed that his Fair Hearing was scheduled for September 11, 2008. Initial discovery motions and notices of depositions were filed by the parties throughout the summer.

While the litigation progressed, the Fair Hearing was held on September 11, 2008, in front of a selected Fair Hearing Committee. Prior to the hearing, on September 5, 2008, the MEC disclosed its list of witnesses for the Fair Hearing, but Chudacoff received no information regarding the nature of the testimony that would be elicited from those witnesses. Hence, Chudacoff had to prepare his case for the Fair Hearing without having knowledge of the specific evidence to be presented against him. Additionally, though Chudacoff's attorney was present at the September 11 hearing, his attorney was not allowed to present evidence, question witnesses, or participate in the hearing in any substantive way.

Aside from addressing the incidents of "substandard care," the Fair Hearing Committee seemed concerned with a discrepancy in Chudacoff's original application to join the UMC medical staff; Chudacoff reported never having had an adverse action taken against him for his practice of medicine. In fact, he had a negative report during his time in the Navy, but that report was later revised by the District Court for the District of Columbia. Chudacoff had not been informed that this topic would be addressed at the hearing.

On October 1, 2008, the Fair Hearing Committee set forth their findings and made recommendations regarding the MEC's sanctions. The Fair Hearing Committee disagreed with the suspension of Chudacoff's privileges and the requirement of direct supervision by another physician. Instead, the committee recommended peer review of Chudacoff's practice. The Fair Hearing Committee agreed with three of the MEC's sanctions: (1) placing Chudacoff on a "zero tolerance policy for disruptive behavior"; (2) requiring Chudacoff to discuss with the Nevada Health Professionals Foundation the necessity of undergoing physical and psychological evaluation; and (3) requiring Chudacoff to undergo drug testing. The Fair Hearing Committee also noted that the "concern about Dr. Chudacoff's falsifying his medical staff application should be

specifically addressed to the MEC with appropriate action."

The Fair Hearing Committee's recommendations were forwarded to the MEC for consideration at its next hearing, which was held on October 28, 2008. At that hearing, which Chudacoff attended, the MEC reviewed and considered the Fair Hearing Committee's recommendations. The purpose of the hearing was to address the Fair Hearing Committee's recommendations related to Chudacoff's alleged incidents of substandard care. Nevertheless, at least one of the members of the MEC focused almost exclusively on Chudacoff's alleged falsification of his medical staff application.

On November 7, 2008, ten days after the MEC's hearing, the MEC notified Chudacoff of its decision with two letters. In the first letter, the MEC adopted in part the findings of the Fair Hearing Committee with respect to requiring peer review of Chudacoff's practice. In addition, the MEC issued a second letter suspending Chudacoff's privileges pending revocation for "material misstatements of fact on [Chudacoff's] medical staff application for privileges." Each letter now represents a separate action taken by the MEC.

Pursuant to the provisions of the Fair Hearing Plan, Chudacoff had thirty days— or until December 7, 2008—to appeal his suspension relating to the misstatements on the application to a Fair Hearing Committee, as that decision had not yet been presented to the Fair Hearing process. Once the MEC suspended Chudacoff's privileges, the MEC had the obligation to report the suspension to the NPDB within fifteen days, or by November 22, 2008. With respect to this potential report, the Court issued a preliminary injunction that prevented the defendants from reporting Chudacoff to the NPDB.

Chudacoff requested a Fair Hearing as to the suspension related to the alleged misstatements of fact on his medical staff application of his privileges. On November 25, 2008, at 9:10 a.m., Chudacoff's attorney was informed that the MEC would meet at 12:30 p.m. that day to discuss the discrepancy in Chudacoff's application. Chudacoff presented his case; less than one hour later the MEC informed him that the MEC would proceed with the suspension of his privileges. (*Id.* ¶ 68.)

Also on November 25, 2008, Chudacoff timely appealed the adoption of the Fair Hearing Committee's recommendations with respect to the substandard level of care issues to the Board of Trustees of the UMC.[1] At a session in early 2009, the Board appears to have sided with Chudacoff in a great number of respects. As a result of the Board's actions, the MEC must now reconsider its initial decision to report Chudacoff to the NPDB for the substandard level of care issue. The Board also mentioned that it may need to rewrite the reporting policies to ensure that a physician is afforded sufficient procedural due process before being suspended. In addition, the Board awarded Chudacoff $10,000 to pay for costs and fees associated with the dispute. The MEC is yet to reconsider its actions.

## II. Procedural Background

Chudacoff originally filed suit (# 1) on July 2, 2008, alleging a violation of due process under the Fourteenth Amendment and assorted state law claims. Chudacoff seeks declaratory and injunctive relief, as well as money damages and attorney's fees.

---

1. The members of the Clark County Board of Commissioners comprise the Board of Trustees.

All of the defendants—University Medical Center, its Commissioners, several individual physicians and others who serve on administrative committees for the medical center, and every physician and dentist who holds staff privileges at the medical center—filed an Answer (# 23) to the complaint on July 23, 2008. Chudacoff filed an amended complaint (# 46) on September 22, 2008; the defendants answered (# 47) that complaint on October 2, 2008. Chudacoff filed a second amended complaint (# 82) on January 6, 2009, to which the defendants filed answers (## 95, 96). The second amended complaint varies from the original complaint in only minor areas and adds an additional cause of action under the United States Constitution.

The Court held a hearing on January 5, 2009, to consider "emergency" motions filed by both sides. The defendants had filed an Emergency Motion (# 48) to Dismiss or Alternatively to Stay the Instant Matter Pending Exhaustion of All Administrative Remedies and Proceedings. The defendants sought to dismiss the case on the basis of immunity under the Health Care Qualified Immunity Act (or "HCQIA"). Chudacoff had filed Emergency Motions (## 55, 57) for Temporary Restraining Order/Preliminary Injunction. We denied the defendants' motion, reasoning that it was inappropriate to resolve the HCQIA matter at the motion to dismiss stage, as the issue turned on questions of fact. We also granted Chudacoff's motion for preliminary injunction and enjoined the defendants from reporting any negative information regarding Chudacoff's suspension of medical staff privileges as a result of his allegedly falsified application.

Chudacoff then sought an order requiring the defendants to remove any negative information they had already reported with the NPDB with respect to the alleged incidents of insufficient medical care. Chudacoff argues that because his due process rights were violated, the defendants should be required to remove any negative information they reported about him. To this end, Chudacoff filed his Emergency Motion (# 85) for Temporary Restraining Order and Preliminary Injunction ("P.'s Mtn. for TRO and PI") on January 9, 2009. Only one group of the defendants—the medical and dental staff of the UMC, John Ellerton, Marvin Bernstein, Dale Carrison, and Donald Roberts—filed a response (# 92) to the motion. The other defendants in the action—Bruce Woodbury, Tom Collins, Chip Maxfield, Lawrence Weekly, Chris Giunchigliani, Susan Brager, the UMC itself, Rory Reid, and Kathleen Silver—filed nothing in response to the motion (# 85).

Additionally, Chudacoff filed a Motion (# 86) for Partial Summary Judgment ("P.'s Mtn. for PSJ"), arguing no genuine issues of material fact existed with respect to his claim that the defendants had violated his due process rights. The first group of defendants filed a response (# 93) to the motion, and this time, the second group of defendants filed a Joinder (# 94) to the response.

We will address Chudacoff's motion (# 86) for partial summary judgment and then turn to his motion (# 85) for preliminary injunction. In both motions, Chudacoff argues that the defendants denied him his procedural due process rights. In response to both motions, the defendants contend that they complied with their own rules and regulations and afforded Chudacoff sufficient notice and opportunity to be heard. Before we discuss the merits of the parties' arguments, we will briefly outline the defendants' written procedures.

### III. The Defendants' Procedures for Adverse Actions

Three documents outline what procedures UMC physicians are to receive when an adverse action is taken against them:

the Bylaws of UMC, the Credentials Procedures Manual (or the "Credentialing Manual"), and the Fair Hearing Plan. We start with the Bylaws.

Article XI of the Bylaws governs administrative actions taken against physicians. (*See* Bylaws, Ex. A at 38 (# 85–4).) If a physician with privileges at UMC engages in any behavior that "is likely to be detrimental to patient safety or to the delivery of quality patient care," any member of the staff of UMC may initiate an administrative action against that physician. If an administrative action is taken against the physician, the action will entail either a "summary suspension" or a "routine administrative action."

A "summary suspension" is an immediately effective suspension of a physician's privileges. A summary suspension is appropriate when a physician's conduct is substantially likely to cause "injury or damage to the health or safety of any patient, employee or other person present in the hospital." The suspension may last for up to 30 days, or until the MEC addresses the matter at its next meeting. Unless the MEC recommends immediate termination of the suspension, the physician is entitled to the procedural rights outlined in the Fair Hearing Plan.

Of critical importance to this case is that Chudacoff's suspension was not a summary suspension. (Ellerton Transcript at 48:18–19, Ex. 1 (# 50–4).) Rather, it was a routine administrative action.

"Routine administrative actions" are governed by Article XII of the Bylaws, Article VI of the Credentialing Manual, and the Fair Hearing Plan. Under Article XII of the Bylaws, a complaint against a physician must be in writing and submitted to the Medical Staff Office, which will then forward the correspondence to the appropriate Department Chief. (Bylaws, Ex. A at 41, (# 85–4).) The physician must then be notified and granted access

to any materials relevant to the incident. If the complaint leads to an adverse action against the physician, the physician is entitled to the procedural protections of the Fair Hearing Plan. A suspension of one's privileges is considered an adverse action. The Bylaws do not specify whether an adverse action may be taken against a physician before the physician has been notified of the complaint asserted against him or her.

Article VI of the Credentialing Manual sets forth the "Administrative Action Procedures." (*See* Credentialing Manual, Ex. B at 78 (# 85–4).) All requests for administrative actions "must be in writing, submitted to the ... MEC and supported by reference to the specific activities or conduct which constitutes the grounds for the request." Once submitted to the MEC, the MEC may then either act on the request or investigate the request. After completing any investigation, the MEC then must act on the request. The MEC may "recommend" any number of actions, ranging from "recommending rejection of the request for administrative action" to "recommending reduction, suspension or revocation of clinical privileges." If the MEC recommends taking an adverse action against the physician, such as decreasing or suspending a physician's privileges, the physician is entitled to the procedural protections of the Fair Hearing Plan. The Credentialing Manual does not specify whether the MEC may make any adverse recommendation before the physician has been notified that there is an action pending against him or her.

The Fair Hearing Plan sets forth the general procedures to follow in the event an "adverse action" is taken against a physician. (*See* Fair Hearing Plan, Ex. L at 18 (# 48–5).) When an adverse action has been taken against a physician, the chief of staff must promptly give the physician no-

tice that an adverse recommendation or action has been taken. The notice, among other things, must advise the physician of three things: (1) the adverse action, (2) the ground upon which the action is based, and (3) the physician's right to request a hearing. The physician has thirty days within which to request a hearing, and failure to request a hearing waives that right.

If the physician requests a hearing, then the chief of staff must give the physician at least thirty days' notice of the time, place, and date of the hearing. At some time prior to the hearing, though exactly when is not clear, the physician is entitled to receive a copy of all medical records or documents expected to be submitted at the hearing, a written report from any expert who will testify setting forth the expert's opinion, and copies of all materials provided by the hospital for the expert's review. At least fifteen days prior to the hearing, the physician must disclose his or her witness list, documents, experts, and arguments to the Medical Staff.

When the hearing convenes, the "physician may represent himself or be represented by any other individual of his choice, including a licensed attorney." A licensed attorney, however, is not allowed to "call, examine, or cross-examine witnesses or otherwise present the case."[2]

The hearing is intended to be an informal, deliberative discussion. To this end, the formal rules of evidence do not apply, and "any relevant matter upon which responsible persons customarily rely in the conduct of serious affairs may be considered." Whoever instituted the initial ad-

verse action presents its side first, and then the physician has the opportunity to rebut. Whoever persuades the Fair Hearing Committee by a preponderance of the evidence prevails.

After the hearing, the committee must deliberate and render a written report of its decision within twenty days of the final adjournment of the hearing. When the committee issues its report, the MEC may then "review, consider, and affirm, modify or reverse its original recommendation" at its next meeting. Presumably, the MEC makes this determination in light of the committee's decision, though nothing in the Fair Hearing Plan so requires. In any event, the physician is allowed to be at this subsequent MEC meeting, with counsel. The MEC's decision is then transmitted to the Chief of Staff within ten days of the MEC's meeting, who then promptly notifies the physician.

If the MEC's decision is adverse to the physician, then the physician has thirty days within which to file an appeal to the Board of Trustees. If appealed, the Board of Trustees is to consider the matter not less than thirty, nor more than sixty, days from the date of the request of the appeal. The physician must submit a written statement to the Board, and the Board, in its sole discretion, may decide whether to hear from the parties or their representatives. The Board may either affirm the MEC's decision (made after the Fair Hearing Committee findings) or "remand the matter to the MEC to conduct further proceedings as directed by the Board." In addition, the "Board may reject or modify the decision of the MEC if the MEC's

---

**2.** Theoretically, anyone could represent the physician, and anyone other than a licensed attorney could present the case. This means that an unlicensed attorney, another physician, a spouse, a friend, or a minor would not be barred from representing the physician at the hearing. However, the licensed attor-

ney—the one of this group presumably trained in advocacy—would have to remain silent. *Cf.* Webster's Ninth New Collegiate Dictionary 574 (1984) (defining "Hobson's Choice" as "an apparently free choice where there is no real alternative").

decision is clearly erroneous in view" of the record as a whole. The decision of the Board is "final," though all of the above provisions "may be amended or repealed, in whole or in part, by the Medical Executive Committee (MEC)."[3]

### IV. Motion for Partial Summary Judgment

Chudacoff's motion for partial summary judgment is limited to whether the defendants violated his due process rights by suspending his hospital privileges and then reporting that suspension to the NPDB without notice or an opportunity to be heard. The only facts relevant here concern whether Chudacoff was denied procedural due process before the defendants reported him to the NPDB with respect to his allegedly substandard level of care. If we find that the defendants deprived Chudacoff of a protected interest without due process, then we must evaluate whether the defendants are entitled to immunity under the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11101, et. seq.

#### A. Standard

Summary judgment allows courts to avoid unnecessary trials where no material factual dispute exists. *N.W. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir.1994). The Court must view the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir.1996), and should award summary judgment where no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law, FED. R.CIV.P. 56(c). Judgment as a matter of law is appropriate where there is no legally sufficient evidentiary basis for a reason-

able jury to find for the nonmoving party. FED.R.CIV.P. 50(a). Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.1995), *cert. denied*, 516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Although the parties may submit evidence in an inadmissible form—namely, depositions, admissions, interrogatory answers, and affidavits—only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment. FED.R.CIV.P. 56(c); *Beyene v. Coleman Security Services, Inc.*, 854 F.2d 1179, 1181 (9th Cir.1988).

In deciding whether to grant summary judgment, a court must take three necessary steps: (1) it must determine whether a fact is material; (2) it must determine whether there exists a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) it must consider that evidence in light of the appropriate standard of proof. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Summary judgment is not proper if material factual issues exist for trial. *B.C. v.*

---

**3.** A literal reading of this last line conceivably means that the MEC could amend the procedures and give itself authority to make any

final determination. There are no set standards for when the MEC may amend or repeal any part of the administrative process.

*Plumas Unified Sch. Dist.,* 192 F.3d 1260, 1264 (9th Cir.1999). "As to materiality, only· disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Disputes over irrelevant or unnecessary facts should not be considered. *Id.* Where there is a complete failure of proof on an essential element of the nonmoving party's case, all other facts become immaterial, and the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Summary judgment is not a disfavored procedural shortcut, but rather an integral part of the federal rules as a whole. *Id.*

**B. Procedural Due Process**

▇▇▇ The Fourteenth Amendment prevents states from depriving individuals of protected liberty or property interests without affording those individuals procedural due process. *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). With procedural due process claims, the deprivation of the protected interest "is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*" *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). Before being deprived of a protected interest, a person must be afforded some kind of hearing, "except for extraordinary situations where some valid government interest is at stake that justifies postponing the hearing until after the event." *Boddie v. Connecticut,* 401 U.S. 371, 378–79, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). In evaluating procedural due process claims, the Court must engage in a two-step inquiry: (1) we must ask whether the state has interfered with a protected liberty or property interest; and (2) we must determine whether the procedures "attendant upon that deprivation

were constitutionally sufficient." *Humphries v. County of Los Angeles,* 554 F.3d 1170, 1184–85 (9th Cir.2009) (quoting *Ky. Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)).

**1. Protected Property Interest**

A protected liberty or property interest is one that is "recognized and protected by state law." *Paul v. Davis,* 424 U.S. 693, 710–11, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). For example, when a state issues licenses to drivers, which confer citizens the right to operate a vehicle in that state, the state may not withdraw that right without affording due process. *Id.* at 711 (citing *Bell v. Burson,* 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971)).

Just as Nevada grants licenses to its drivers, so too does it grant licenses to qualified physicians to practice medicine. In Nevada, Chapter 630 of the Revised Statutes generally governs the licensing of physicians in the state. *See* Nev.Rev. Stat. §§ 630.003–630.411; *see also Moore v. Bd. of Trs. of Carson–Tahoe Hosp.,* 88 Nev. 207, 495 P.2d 605, 608 (Nev.1972) (recognizing a "right … subject to … reasonable rules and regulations" to "enjoy medical staff privileges in a community hospital"). Further, UMC's bylaws and regulations provide for extending privileges to physicians to practice at the hospital provided that certain requirements are met. (*See* Bylaws, Ex. A (# 85–4); Credentialing Manual, Ex. B (# 85–4); Fair Hearing Plan, Ex. L (# 48–5).) A physician's medical staff privileges are thus a protected interest under Nevada state law.

▇▇▇ Chudacoff was both a licensed physician in the state and he had medical staff privileges at UMC. The defendants have attempted to revoke Chudacoff's privileges at UMC. This protected interest cannot be

revoked without constitutionally sufficient procedures.

## 2. Whether the Procedures Were Constitutionally Sufficient

Chudacoff argues that because he was not "summarily suspended," the defendants were required to follow the process for "routine administrative actions" as set forth by UMC Bylaws and its Fair Hearing Plan. (P.'s Mtn. for PSJ at 12(# 86).) Chudacoff asserts that the defendants did not follow these procedures and that their course of action violated his due process rights. The defendants contend that they followed their Bylaws and that nothing more was required.

The amount of process that is due is a "flexible concept that varies with the particular situation." *Zinermon,* 494 U.S. at 127, 110 S.Ct. 975. The Court tests this concept by weighing several factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
> *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

The private interest at stake here is the ability to practice medicine at a particular location. The interest extends further, however, in that a suspension of privileges at one hospital, when reported to the NPDB, could limit a physician's ability to practice anywhere in the country. The amount of process must accord sufficient respect for a professional's life and livelihood.

Next, the risk of an erroneous deprivation is also significant, as an improper suspension would have dramatic consequences for the physician. Additionally, the NPDB only serves as a reliable source of information if it receives accurate reports; an erroneous report reduces the NPDB's utility. As a result, there are substantial benefits to having procedural safeguards in place to protect both the physician and the NPDB from erroneous or improper reporting. Both are best served by having the safeguards in place on the front-end of the decision-making process; neither is served by remedial provisions. Once the damage is done, it is hard to undo.

Third, it is important for the state to have control over the quality of care that its physicians provide. The state has an interest in insuring that it can discipline malfeasance without further burdening limited state resources.

Given the important interests outlined above, it simply cannot be that in a "routine administrative action" a physician may have his privileges revoked without ever having a chance to refute or challenge the accusations leveled against him. The MEC met late in May 2008 to discuss allegations concerning Chudacoff's level of care, allegations that Chudacoff did not know were being leveled against him. The MEC, under the guise of an administrative action, suspended Chudacoff's medical staff privileges.[4] Without ever even knowing that his privileges were in jeopardy, Chudacoff was informed of the loss of his privileges on May 28, 2008. The NPDB was informed of the suspension on June

---

4. It is not clear how the MEC was able to suspend Chudacoff at this early time; under the Fair Hearing Plan, it seems that the MEC could only "recommend" taking a certain course of action. (*See* Credentialing Manual, Ex. B at 78–79 (# 85–4).)

16, 2008, well before Chudacoff ever had an opportunity to be heard on the matter.

 The fatal flaw here is that the defendants suspended Chudacoff's staff privileges before giving him any type of notice or opportunity to be heard with respect to that suspension. Chudacoff's due process rights were violated by the timing of the MEC's actions.[5] Because we conclude that the defendants have violated Chudacoff's procedural due process rights, we must now evaluate whether they are nevertheless entitled to immunity from damages under the HCQIA.

### C. HCQIA Immunity

Under the HCQIA, Congress sought to remedy the national need to restrict incompetent physicians from moving from state to state through "effective professional peer review." 42 U.S.C. § 11101(3). To alleviate concerns of lawsuits with respect to peer review, Congress granted "limited immunity from suits for money damages to participants in professional peer review actions." *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 632 (3d Cir. 1996); *Austin v. McNamara*, 979 F.2d 728, 733 (9th Cir.1992) ("HCQIA was designed both to provide for effective peer review and interstate monitoring of incompetent physicians and to grant qualified immunity from damages for those who participate in peer review activities.").

The defendants contend that Chudacoff's allegations stem from the actions taken by the MEC, through its peer review process, in response to patient safety concerns, and members of the staff who participated in the peer review process are thus protected under the immunity provisions of the HCQIA. Chudacoff responds that HCQIA immunity is not a blanket grant of immunity, but is subject to certain statutory requirements that were not met here. Chudacoff's chief argument is that the MEC suspended his license prior to providing him with any procedural safeguards. He notes that even when he was allowed to present evidence at the Fair Hearing on September 11, 2008, his suspension had already been reported to the National Practitioner Data Bank.

Under the HCQIA, if a "professional review action," as defined by the statute, meets certain due process and fairness requirements, then the review participants "shall not be liable in damages ... with respect to the action." 42 U.S.C. § 11111(a)(1). The HCQIA creates a rebuttable presumption of immunity, forcing the plaintiff to prove that the defendants' actions did not comply with the relevant standards. *Id.* § 11112(a) ("A professional review action shall be presumed to have met the preceding standards necessary for ... [immunity from damages] unless the presumption is rebutted by a preponderance of the evidence.").

Whereas qualified immunity under § 1983 is a question of law that provides immunity not merely from liability but from suit altogether, *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), HCQIA immunity "is immunity from damages only," *Singh v. Blue Cross/Blue Shield of Mass., Inc.*, 308 F.3d 25, 35 (1st Cir.2002); *Decker v. IHC Hosps., Inc.*, 982 F.2d 433, 436 (10th Cir. 1992) (holding that HCQIA immunity is "immunity from liability only," not immunity from suit); *see Austin*, 979 F.2d at 733. HCQIA immunity does not shield a defendant from injunctive relief. *See* 42 U.S.C. § 11111(a)(1) (limiting immunity to liability "in damages").

---

**5.** In light of our conclusion, we need not resolve whether Chudacoff's due process rights were also violated by any absence of a writing from Dr. Ellerton to the MEC or when Chudacoff's counsel was not allowed to present his case at the hearing.

For HCQIA immunity to apply, the defendants must meet four requirements. *Austin*, 979 F.2d at 733. First, the defendants must comply with the fairness standards set forth in 42 U.S.C. § 11112(a). *Id.* Second, the defendants must provide adequate notice and a hearing. *See id.*[6] Third, the defendants must report the results of the review action to the appropriate authorities in compliance with 42 U.S.C. §§ 11131–34. *Id.* Fourth, the review action must have been commenced after the effective date of the HCQIA, November 14, 1986.[7] *Id.*

In the typical case, a plaintiff asserts a claim against a medical review board, and then the board moves for summary judgment on the basis of HCQIA immunity. In that case, the rebuttable presumption "creates a somewhat unusual [summary judgment] standard" that can be stated as follows: "Might a reasonable jury, viewing the facts in the best light for [the plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)?" *Id.* at 734; *e.g. Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1333 (11th Cir.1994).

This is not the typical case; here, the plaintiff has moved for summary judgment on the HCQIA issue. To prevail, the plaintiff must overcome the presumption that the defendants are entitled to HCQIA immunity. Thus, our inquiry is to determine whether a jury, viewing the facts in the best light for the defendants, might conclude that the plaintiff has failed to show, by a preponderance of the evidence, that the defendants' actions were outside the scope of the statute. Put another way, viewing the facts in the defendants' favor, has the plaintiff shown that the defendants' actions failed to comply with § 11112(a)?

### 1. Fairness Elements of 42 U.S.C. § 11112(a)

The fairness standards set forth in 42 U.S.C. § 11112(a) have four sub-requirements. The section provides that a professional review action must be taken:

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.

42 U.S.C. § 11112(a).

Turning to the first sub-requirement, the defendants likely had a reasonable belief that their actions were taken in furtherance of quality health care. The "reasonable" standard is an objective test, not

---

**6.** In *Austin,* the Ninth Circuit stated that this element required the defendants to satisfy § 11112(b)'s standard of adequate notice and hearing. 979 F.2d at 733. As the court clarified in *Smith v. Ricks,* § 11112(b) is a safe harbor provision and does not impose any additional requirements for immunity. 31 F.3d 1478, 1485 n. 5 (9th Cir.1994); 42

U.S.C. § 11112(b) (stating that a "failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3) of this section").

**7.** No one challenges the fourth criterion, so it need not detain us.

a subjective one. *Austin*, 979 F.2d at 734. As such, the Court need not concern itself with claims of animosity on the part of some of the defendants; even if true, these claims would be irrelevant to an objective test. *See id.* The issue turns on whether the defendants could reasonably believe that suspending Chudacoff for the quality of care he provided furthers quality health care. The hospital's report to the NPDB shows that Chudacoff was suspended for a cluster of adverse medical results in a short period of time. A hospital reasonably would not want to extend privileges to a physician that was not practicing medicine at an appropriate level. We therefore conclude that it is possible that the suspension was to further quality health care at UMC.

Second, whether the defendants acted after a reasonable effort to obtain the facts of the matter is a closer question. The parties dispute how much of an investigation Dr. Ellerton undertook before referring the matter to the MEC. Chudacoff has presented evidence that Dr. Ellerton, who is not an OB/GYN, might not have had the knowledge necessary to independently make any determination as to the appropriate level of medical care. Nevertheless, a reasonable jury could conclude that Dr. Ellerton's investigation, which included a review of patient medical records, was within the scope the HCQIA. The matter remains an open question of fact.

With respect to the third sub-requirement, as we concluded above, the notice and hearing procedures afforded to Chudacoff were insufficient. The plain language of § 11112(a)(3) mandates that a review action cannot be taken until "*after* adequate notice and hearing procedures are afforded to the physician involved *or after* such other procedures as are fair to the physician under the circumstances." 42 U.S.C. § 11112(a)(3) (emphasis added). The lack of a pre-deprivation hearing was fundamentally unfair to Chudacoff. Nevertheless, section 11112(b), discussed below, could provide a safe harbor for adequate notice and hearing under 42 U.S.C. § 11112(a)(3).

Regarding the fourth sub-requirement, the parties disagree as to whether the action was warranted, and the parties disagree about whether the defendants engaged in "reasonable efforts" to obtain the facts of the matter. This issue also appears to be an open question.

At bottom, to have immunity under the statute, the defendants must meet all of the elements of 42 U.S.C. § 11112(a). As we concluded above with the due process issue, the defendants did not provide Chudacoff with reasonable notice or an opportunity to be heard regarding the adverse actions taken against him. Thus, if we find that the defendants do not qualify for the safe harbor of 42 U.S.C. § 11112(b), then the open questions of fact regarding the first and third sub-requirements become non-material to the question of summary judgment on the issue of HCQIA immunity. We turn now to that issue.

### 2. Notice and Hearing Elements under § 11112(b)

Section 11112(b) provides a safe harbor for health care entities with regard to the notice and hearing requirements for HCQIA immunity. In part, the section provides:

A health care entity is deemed to have met the adequate notice and hearing requirement of subsection (a)(3) of this section with respect to a physician if the following conditions are met (or are waived voluntarily by the physician):

(1) Notice of proposed action

The physician has been given notice stating—

(A) (i) that a professional review action has been proposed to be taken against the physician,

(ii) reasons for the proposed action,

(B) (i) that the physician has the right to request a hearing on the proposed action,

(ii) any time limit (of not less than 30 days) within which to request such a hearing, and

(C) a summary of the rights in the hearing under paragraph (3).

(2) Notice of hearing

If a hearing is requested on a timely basis under paragraph (1)(B), the physician involved must be given notice stating—

(A) the place, time, and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and

(B) a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.

42 U.S.C. § 11112(b).

Most important for present purposes is that the statute requires that the "physician has been given notice stating that a professional review action has been proposed to be taken against the physician."

The timing of the notice is critical to understanding this provision. The first phrase—that the physician "has been given notice"—indicates that the health care entity has informed the physician of a review action. This phrase expresses that the giving of the notice occurred in the past ("has been given").

The second part of the phrase—that a "review action has been proposed to be taken"—signifies that the review action has not yet come to fruition. While the review action has "been proposed," it has not already "been taken." Instead, the "proposed action" is still "to be" taken. That is, it will occur, if at all, in the future.

Were it sufficient for the defendants merely to give the plaintiff notice of the review action after the fact, the statute would read as follows: "The physician has been given notice stating that a professional review action has been taken against the physician." This variation omits the operative phrase "proposed to be," which clearly denotes when in the course of events the review action must take place.

■ Thus, for HCQIA immunity to apply, the notice given to the physician must state that a review action is going to take place in the future. It is not sufficient for the physician to be told, after the fact, that a review action has been taken against him already. The defendants have not met the requirements of the safe harbor provision.

### 3. Reporting Requirements of 42 U.S.C. § 11131–34

The relevant reporting requirements of 42 U.S.C. §§ 11133–34 require health care entities to report to a state Board of Medical Examiners any adverse action that "affects the clinical privileges of a physician for a period longer than 30 days" within a specified time—in essence, not more than sixty days. Other than the issues discussed above, it does not appear that there was anything deficient with the way in which the defendants reported Plaintiff's suspension to the Board.

Nevertheless, because the defendants did not comply with the notice and hearing requirements of the statute, they are not entitled to HCQIA immunity.

### V. Motion for Preliminary Injunction

Chudacoff has also a filed a motion for preliminary injunction (# 85). Chudacoff seeks to require the defendants to withdraw the adverse information lodged with the NPDB with respect to Chudacoff's alleged substandard level of care.

Requiring the defendants to lift the NPDB report regarding Chudacoff's ability to practice medicine turns this motion into one for a mandatory injunction. While the normal purpose of an injunction is to maintain the status quo before trial to preserve the rights of the parties, a mandatory injunction requires a party to perform a specific act to remedy allegedly harmful conduct. *Dahl v. HEM Pharm. Corp.*, 7 F.3d 1399, 1403 (9th Cir.1993); *see Texas & N.O.R. Co. v. Northside Belt Ry. Co.*, 276 U.S. 475, 479, 48 S.Ct. 361, 72 L.Ed. 661 (1928). Courts require a higher burden to be met in order to issue mandatory injunctions because the requested action would force the non-moving party to go beyond simply maintaining the status quo. *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir.1994). "When a mandatory preliminary injunction is requested, the district court should deny such relief unless the facts and law clearly favor the moving party." *Id.* (internal quotation marks omitted).

Chudacoff's requested injunction is rooted in the MEC's decision to suspend his hospital privileges without giving him procedural safeguards. That is, there are two parts to Chudacoff's underlying claim: (1) he was denied procedural due process; and (2) the MEC improperly suspended his privileges.

Regarding this first claim, we concluded above that Chudacoff was denied his procedural due process rights. Nevertheless, we have not considered whether the MEC's decision was ultimately substantively correct. Nor need we venture down that path now.

Had Chudacoff been afforded the proper procedural due process, he would have had notice and a hearing before the MEC suspended his privileges. The MEC, howev-er, would still have had the authority to recommend suspending Chudacoff's privileges if all of the administrative procedures were followed and if the allegations had merit. Of course, Chudacoff also could have prevailed.

The remedy Chudacoff seeks here would require the defendants to give him the appropriate procedural due process. Whether or not we require the defendants to pull the adverse report with the NPDB now, the Court would remand the matter back to the MEC to decide the case as if Chudacoff had never been reported to the NPDB in the first place.

It appears from the papers before the Court that the case already is back before the MEC, just as the Court would have ordered. (*See* D.s' Opp. to Mtn. for TRO/PI at 6 ("The Board [of Trustees] ordered the parties to conduct a new Fair Hearing on the issues related to the May 27, 2008 actions by the MEC within the next sixty (60) days." (# 92))).[8] Depending on how the substantive administrative proceedings turn out, it will become clear what further order, if any, the Court must issue. At the present time, it is premature to attempt to fashion any injunctive relief.

In short, the administrative process needs to run its course before the Court issues any injunctive relief, as the matter may be resolved without any additional Court action. While Chudacoff's procedural rights have been violated, it is too early to hazard a guess as to whether his substantive rights have been so affected.

## VI. Conclusion

Prior to being deprived of a protected property interest, Dr. Chudacoff was entitled to notice and an opportunity to be

---

8. It is not clear what result, if any, the MEC reached, though the hearing should have been held by March 20, 2009.

heard. He was not afforded constitution-ally sufficient procedural protections. Partial summary judgment in his favor is appropriate. Further, the defendants are not entitled to HCQIA immunity because they did not comply with the required statutory provisions.

Additionally, the administrative proce-dures already under way need to run their course. Once they do, the Court may fashion an injunctive remedy, if appropri-ate.

*IT IS, THEREFORE, HEREBY OR-DERED THAT* the plaintiff's motion for partial summary judgment (# 86) is **GRANTED.**

*IT IS FURTHER ORDERED THAT* the plaintiff's motion for preliminary in-junction (# 85) is **DENIED.**