JUSTICE RICE,
dissenting.
¶48 This decision places the professional reputation of a doctor, suspended for violations of medical ethics, over the health, safety and *393 welfare of his patients and of the public. The District Court’s issuance of an injunction preventing CMC from performing its express legal duty to report its investigative suspension of Dr. Doe to the national and state boards of medical examiners has eviscerated the careful process provided and required by 42 U.S.C. §11101, et seq. and §37-3-403, MCA (2007). Because Congress enacted procedural safeguards under the Health Care Quality Improvement Act of 1986 (HCQIA), which permit physicians to challenge such mandatory reports, state injunctive remedies have been preempted. Even if federal preemption had not occurred, the District Court manifestly abused its discretion in issuing the injunction under state law.
¶49 Congress enacted the HCQIA to improve the quality of health care by ‘identifying] and disciplining] those who engage in unprofessional behavior.” U.S. Department of Health and Human Services, National Practitioner Data Bank Guidebook A-2 (Sept. 2001) (available at http://www.npdb-hipdb.hrsa.gov/pubs/gb/NPDB_ Guidebook.pdf) (hereinafter NPDB Guidebook); see 42 U.S.C. §11101, et seq. Congress established the National Practitioner Data Bank (NPDB) ‘to address the problems that can result when doctors who are identified by their peers as being incompetent or unprofessional are able to move and continue their [medical] careers without anyone being aware of their previous incompetence or unprofessional actions.” Simpkins v. Shalala, 999 F. Supp. 106, 110 (D.D.C. 1998) (citing 42 U.S.C. § 11101(1) and (2)). Under the HCQIA, a hospital that suspends a physician for more than 30 days must report that suspension to the national Board of Medical Examiners and the NPDB. 42 U.S.C. § 11133(a)(1)(A); 45 C.F.R. §60.9(a)(l)(i). The NPDB is an “alert,” or ‘flagging system.” The information is intended to “direct discrete inquiry into and scrutiny of specific areas of a practitioner’s licensure [and] record of clinical privileges.” NPDB Guidebook, A-3. ‘The NPDB is intended to augment, not replace, traditional forms of credentials review,” and as such is yet “another resource to assist State licensing boards, hospitals, and other health care entities in conducting extensive, independent investigations of the qualifications of the health care practitioners they seek to license or hire, or to whom they wish to grant clinical privileges.” NPDB Guidebook, A-3.
¶50 These provisions make clear that “[t]he information in the NPDB should serve only to alert State licensing authorities and health care entities that there may be a problem with a particular practitioner’s professional competence or conduct.”NPDB Guidebook, A-3 (emphasis added). The information reported to the NPDB is confidential, and *394 disclosed only to appropriate agencies or persons. 45 C.F.R. §60.13; NPDB Guidebook, A-3. Contrary to the Court’s previous analogy of a report being a “scarlet letter” on the doctor’s record, Cole, ¶ 23, the confidential report serves only to alert other hospitals and medical facilities of the pending investigative proceedings and disciplinary actions. Carefully, Congress specifically identified the suspension or disciplinary proceedings which require a report to the NPDB, while likewise identifying those proceedings which are not to be reported. 45 C.F.R. §60.3(a)~(d); NPDB Guidebook, Chapter E Reports.
¶51 Critically, in addition to establishing reporting requirements, the HCQIA regulations also establish an administrative remedial proceeding whereby a reported physician “may dispute the accuracy of information in the Data Bank concerning himself or herself.”45 C.F.R. § 60.14(a); Brown v. Med. College of Ohio, 79 F. Supp. 2d 840, 844 (1999). “When a physician initiates such a dispute, a ‘dispute notation’ is added to the report, and any hospital requesting information about a reported physician is informed that the report is in dispute.” Brown, 79 F. Supp. 2d at 844 (citing NPDB, Fact Sheet on the Dispute Process, (available at http://www.npdb-hipdb.hrsa.gov/pubs/fs/Fact_SheetDispute_Process.pdf) (hereinafter NPDB Fact Sheet)); NPDB Guidebook, Chapter F Disputes.
¶52 Throughout this dispute proceeding, the physician is provided a panoply of due process rights, starting with adequate notice and specific hearing requirements. 42 U.S.C. § 11112(a )-(c); see NPDB Guidebook, Chapters E Reports, F Disputes. The hearing must be conducted by a mutually acceptable arbitrator, hearing officer, or panel of individuals appointed by the entity and not in direct economic competition with the physician involved. 42 U.S.C. §11112(b)(3)(A)(i)-(iii). At the hearing, the physician possesses numerous rights by statute, including the right to be represented by an attorney or other person of the physician’s choice; to have a record made; to call, examine, and cross-examine witnesses; to present evidence; and to submit written statements. 42 U.S.C. §11112(b)(3)(C)(i)-(D)(ii).
¶53 The reporting agency is also required to report a “reversal of a professional review action or reinstatement of a license.” 45 C.F.R. § 60.6(b) and 60.9; NPDB Guidebook, E-5-7; NPDB Fact Sheet. Thus, if the physician prevails, and the suspension is reversed or modified, the reporting agency must file an additional report to void, remove or revise the original report. NPDB Guidebook, E-5-7.
¶54 The Court reasons that the HCQIA does not preempt state law remedies because it “does not provide a federal injunctive remedy.” *395 Opinion, ¶ 30. In the Court’s view, because Dr. Doe could not federally enjoin CMC from reporting to the NPDB and the MBME prior to resolution of his case on the merits, there can be no preemption. Opinion, ¶ 30.
¶55 I believe this holding is incorrect, both legally and practically. Of paramount importance to Congress was protecting the public by bringing to light physicians even suspected of medical ethics violations. In the categories designated, Congress wanted an initial report in all cases, and thus, there is no ‘federal injunctive remedy” under the HCQIA. Instead, Congress provided an administrative procedure by which a physician can designate a report as “disputed” and challenge the validity of the report. Thereafter, reports found to be without merit must be retracted or corrected.
¶56 In Diaz v. Provena Hosps., 817 N.E.2d 206, 212-13 (Ill. App. 2 Dist. 2004), the Appellate Court of Illinois concluded that the HCQIA preempted entry of an order enjoining reporting. The court recognized that federal law impliedly preempts state law if (1) a state common-law claim directly conflicts with federal law, (2) it is impossible to comply with federal law without incurring liability under state common law, or (3) “state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Diaz, 817 N.E.2d at 212-13 (quoting Sprietsma v. Mercury Marine, 537 U.S. 51, 65, 123 S. Ct. 518, 527 (2002); Freightliner Corp. v. Myrick, 514 U.S. 280, 287, 115 S. Ct. 1483, 1487 (1995)); Wis. Pub. Intervenor v. Mortier, 501 U.S. 597, 604-05, 111 S. Ct. 2476, 2481-82 (1991).[1] In Diaz, the trial court’s injunction had placed the Hospital in an irreconcilable position: it was required to report Dr. Diaz to the NPDB under federal law, yet would be fined and held in contempt if it disobeyed the state court’s injunction against reporting. The Diaz Court also concluded that the trial court’s injunction impeded the accomplishment of Congress’s objectives under the HCQIA, which are ‘intended to protect patients, not doctors.” Diaz, 817 N.E.2d at 212-13; see also Taylor v. Kennestone Hosp., Inc., 596 S.E.2d 179, 186-87, and n. 4 (Ga. App. 2004) (HCQIA only preempts that state law to the *396 extent the federal and state laws conflict).
¶57 Though stated somewhat differently, Montana’s preemption law essentially mirrors these concepts. Federal law can preempt state law in three ways: (1) Congress expressly provides that state law will not apply in the area governed by the federal statutes; (2) the state law actually conflicts with the federal law (called “conflict preemption”), which occurs when “one cannot comply with both state and federal law, or when ‘the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress;”’ or (3) Congress impliedly preempts state law “where the regulation of the area is so comprehensive that it is reasonable to conclude that Congress intended to ‘occupy the field’ and to leave no room for supplementary state regulation.” Fenno v. Mountain West Bank, 2008 MT 267, ¶ 11, 345 Mont. 161, 192 P.3d 224 (citing Vitullo v. Intl. Bhd. of Elec. Workers, Loc. 206, 2003 MT 219, ¶ 14, 317 Mont. 142, 75 P.3d 1250; Favel v. Am. Renovation and Constr. Co., 2002 MT 266, ¶ 40, 312 Mont. 285, 59 P.3d 412).
¶58 The District Court’s order here has placed CMC in the same irreconcilable position as the Hospital in Diaz. It faces the same Hobson’s choice: report Dr. Doe as required under federal law and face contempt for violating the state court injunction, or comply with the District Court’s injunction and violate federal law. This is what our cases have described as “conflict preemption.” Fenno, ¶ 11 (citations omitted). Further, enjoining the reporting contravenes the express purpose of the HCQIA, and thus establishes implied preemption. ‘Congress has determined that it is important for these entities to have access to data ... while investigations are pending, in order to protect the health and safety of patients by preventing incompetent physicians from continuing to practice without any record of past problems.” Diaz, 817 N.E.2d at 213 (emphasis added). Congress established a comprehensive regulatory scheme to accomplish these goals, and enjoining CMC from reporting obviates this purpose, keeping other hospitals, physicians, and the public ignorant of Dr. Doe’s suspension at CMC. As the Diaz Court recognized, by failing to notify the proper authorities about Dr. Doe, ‘the trial court directly thwarts Congress’s objectives in enacting the HCQIA.” Diaz, 817 N.E.2d at 213. And, as recognized in a recent federal district court decision, a physician’s request for an injunction against reporting is inappropriate prior to exhaustion of the HCQIA administrative process. Chudacoff v. Univ. Med. Ctr. of S. Nev., 609 F. Supp. 2d 1163, 1178 (D. Nev. 2009). I disagree with the Court that the decision in Cole *397 stands for the proposition that a hospital’s federal reporting requirements can be enjoined. Opinion, ¶ 28. Federal preemption was not raised in Cole.
¶59 Even assuming arguendo that there was not federal preemption, the District Court manifestly abused its discretion in its application of §27-19-201, MCA, and the Shammel factors. Given the intent, purpose and administrative process under the HCQIA, there is no irreparable danger to Dr. Doe’s professional reputation. See Giannoukos v. Harp, 369 F. Supp. 2d 715, 719 (E.D. Va. 2005) (harm to the physician’s reputation is “mere speculation”). As detailed above, Congress wanted reporting even in suspected cases of medical ethics violations, and provided administrative remedies for erroneous reporting to protect a physician’s reputation. Although the Court offers that “a ringing bell cannot be unrung,” Opinion, ¶ 37, Congress has ordered the bell rung. ¶60 The real danger here is not the possible harm to Dr. Doe’s reputation, but to the public. At stake are the safety and welfare of anyone under that physician’s care. If the report later proves unfounded, the report will be retracted. However, if the report proves true, those under that physician’s care would have been protected during the process. Without such supervision and oversight, patients’ lives may unnecessarily be placed in jeopardy.
¶61 By preventing reporting, the Court disregards our long-held tenets that we will not interpret statutes to defeat their obvious purposes, and that we must be cognizant of what the legislature intended. Murphy for L.C. v. State, 229 Mont. 342, 346, 748 P.2d 907, 909 (1987) (citing Mont. Wildlife Fedn. v. Sager, 190 Mont. 247, 264, 620 P.2d 1189, 1199 (1980)). When dealing with protections for the public safety and welfare, it is for the legislature to decide what regulations are needed. Sager, 190 Mont. at 261, 620 P.2d at 1198 (citations omitted). Affirming the injunction which prevents CMC from reporting under 42 U.S.C. §11101, et seq. and §37-3-403, MCA, not only effectively eviscerates the federal and state statutes, but creates a precedent under which the potential harm to the physician’s professional reputation outweighs the interest in public safety and welfare. Further, this decision fails to acknowledge other potential consequences. For example, a hospital’s failure to report suspensions as legally-required can result in loss of HCQIA immunity. 42 U.S.C. §§ 11111(b), 11133(c); 45 C.F.R. § 60.9(c); Babcock v. St. Francis Med. Ctr., 543 N.W.2d 749, 755-56 (Neb. App. 1996) (recognizing that both the hospital and the state medical board are subject to sanctions under the HCQIA if they fail to comply with the Act’s reporting *398 requirements).
¶62 By concluding that Dr. Doe’s interests are not being elevated over those of the public, the Court states that “there was no evidence presented that Dr. Doe was a danger to patients or staff at any hospital in which he is privileged to practice.” Opinion, ¶ 38. This ignores, however, Dr. Doe’s violation of the ethical rules of not treating one’s self or family; his ordering of hundreds of laboratory tests and a large number of imaging studies on himself, his wife, and his two minor children; his refusal to provide any information to the CMC medical staff about the tests and studies he ordered; his inconsistent and contradictory statements to the CMC medical staff regarding the tests; and his refusal to undergo a psychiatric evaluation by a provider designated by the CMC Medical Executive Committee. Also ignored is the opinion of 16 peer physicians at CMC who unanimously voted to suspend Dr. Doe’s hospital privileges for concerns related to his exercise of poor medical judgment. Further evidence of Dr. Doe’s medical competence was foreclosed by Dr. Doe’s failure to provide information to those supervising him. The unanimous opinion of the 16-member medical panel about Dr. Doe could well be legitimate.
¶63 I would reverse the injunction.

 Even when Congress has not chosen to occupy a particular field, preemption may occur to the extent that state and federal law actually conflict. Such a conflict arises when “compliance with both federal and state regulations is a physical impossibility,” Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S. Ct. 1210, 1217 (1963), or when a state law “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Hines v. Davidowitz, 312 U.S. 52, 67, 61 S. Ct. 399, 404 (1941).