Charles **WILLIAMS**, M.D., Plaintiff,

v.

**UNIVERSITY MEDICAL CENTER OF SOUTHERN NEVADA; John Ellerton, M.D.; Board of Trustees of UMC; Rory Reid; Steve Sisolak; Tom Collins; Larry Brown; Lawrence Weekly; Chris Giunchigliani; Susan Brager; and Medical and Dental Staff of the University Medical Center of Southern Nevada, Defendants.**

No. 2:09–CV–00554–PMP–PAL.

United States District Court,
D. Nevada.

Feb. 25, 2010.

Jacob L. Hafter, Michael K. Naethe, Law Office of Jacob Hafter & Associates, Las Vegas, NV, for Plaintiff.

David Roger, District Attorneys Office, Las Vegas, NV, Lisa J. Jolly, Jimmerson Hansen, Las Vegas, NV, Lynn M. Hansen, Jimmerson Hansen, P.C., Las Vegas, NV, for Defendants.

## *ORDER*

PHILIP M. PRO, District Judge.

Presently before the Court is Plaintiff's Motion for Partial Summary Judgment (Doc. # 53), filed on September 2, 2009. Defendants filed an Opposition (Doc. # 56) on September 21, 2009, and an errata (Doc. # 58) on September 27, 2009. Plaintiffs filed a Reply (Doc. # 61) on October 5, 2009. Defendants filed a Supplement (Doc. # 84) on December 16, 2009. The Court held a hearing on this motion on December 21, 2009. (Mins. of Proceedings (Doc. # 86).)

Also before the Court is Defendants' Motion for Summary Judgment on the Issue of Immunity Under HCQIA (Doc. # 67), filed on November 12, 2009. Plaintiff filed an Opposition (Doc. # 72) on November 30, 2009. Defendants filed a Reply (Doc. # 83) on December 14, 2009.

## I. BACKGROUND

This case arises from Defendants' decision to suspend Plaintiff Charles Williams' ("Williams") privileges to practice at Defendant University Medical Center of Southern Nevada ("UMC"). Williams is an anesthesiologist who had medical privileges to work at several hospitals in Nevada, including Defendant UMC. Defendant John Ellerton ("Ellerton") is the Chief of Staff at UMC. Defendant Medical and Dental Staff of UMC ("Medical Staff") is a professional collegial body created by UMC's Bylaws through which physicians obtain privileges at UMC. The Bylaws also create the Medical Executive Committee ("MEC"), a body which is empowered to act on behalf of the Medical Staff. Defendant Board of Trustees of UMC consists of the Clark County Commissioners,[1] who act as UMC's Board and have final approval authority over UMC's Bylaws, as well as final review authority over the MEC's decisions to suspend or revoke a physician's privileges.

On March 1, 2005, a nurse named Diane Liebrader ("Liebrader") submitted a report regarding Williams to the UMC hotline, a dedicated phone line for physician and nurse complaints. (Defs.' Opp'n to Pl.'s Mot. Summ. J. (Doc. # 56) ["Defs.' Opp'n"], Ex. J.) According to the hotline complaint, a patient was coming back from having a tracheostomy and peg tube placed. (Id.) Liebrader stated that Williams was manually ventilating the patient with an "ambu bag" with one hand while trying to connect the patient to the ventilator with the other, but he did not appear to know how to get the ventilator to work. (Id.) Liebrader stated Williams continued to ventilate the patient manually using the ambu bag until he suddenly dis-

connected the ambu bag, laid it on the bed, and walked toward the door to speak with the respiratory therapist who had just arrived. (Id.) Liebrader grabbed the ambu bag and started ventilating the patient, and when Williams returned to the room, she asked him why he had left the room without instructing her to ventilate the patient. (Id.) According to Liebrader, Williams became antagonistic with her. (Id.)

Upon learning about the hotline complaint against him, Williams called the hotline and spoke with Kim Voss ("Voss"), Executive Director of Performance Improvement in Medical Staff Services. (Pl.'s Mot. Summ. J. (Doc. # 53) ["Pl.'s Mot."], Ex. T at 83–84.) Williams expressed that he did not think it was appropriate for the nurse to use the hotline to complain about him. (Id. at 84.) According to Voss, Williams was belligerent, and kept interrupting her and telling her the process was flawed. (Id. at 84, 91.) Voss informed Williams he could provide a response to the hotline complaint but Williams did not do so. (Id. at 86.)

On March 7, Dr. Gary Shen ("Shen") wrote a letter to UMC's Chief of Staff, Defendant Ellerton, regarding Shen's concerns related to a surgery performed on patient "WP"[2] on March 5 for which Williams was the anesthesiologist. (Defs.' Opp'n, Ex. H.) According to Shen, the surgery was uneventful, but as he was dressing the wound, the patient woke up from anesthesia and Williams extubated the patient. (Id.) "It became clear immediately that the patient could not protect his airway and Dr. Williams was unable to re-intubate." (Id.) The surgical team performed an emergency cricothyroidotomy

---

1. Defendants Steve Sisolak, Tom Collins, Larry Brown, Lawrence Weekly, Chris Giunchigliani, Susan Brager, and Rory Reid, sued in their official capacities.

2. Referred to by initials to protect patient privacy.

and an airway was re-established. (*Id.*) During this episode, the patient arrested and was resuscitated, but suffered anoxic brain injury. (*Id.*)

Ellerton telephoned Williams on March 7 and advised Williams his privileges were summarily suspended for his actions in the WP case. (Pl.'s Mot., Ex. U at 315.) That same day, Ellerton sent Williams written confirmation of his summary suspension from UMC. (Defs.' Opp'n, Ex. C.) The letter contained no information other than advising Williams that he was summarily suspended. (*Id.*)

On March 15, Ellerton sent Williams a letter notifying Williams that the MEC would review Williams' summary suspension under the terms of UMC's Bylaws. (Defs.' Opp'n, Ex. A.) Ellerton's letter advised Williams to "be prepared to discuss with the MEC the following:"

1.  What happened to patient WP in the time leading up to and including the emergency chricothyroidotomy?

2.  The hotlines involving the premature extubation of patients. Why did you extubate the patients and leave indicating it was the nurses' problem to ensure airway management in these patients?

3.  Your interaction with the Executive Director of Performance Improvement and Medical Staff concerning the hotline complaints filed about your actions. Specifically, explain why you declined to dictate responses on the confidential Performance Improvement hotline and instead threatened to settle this your own way. Your conversation was interpreted as being threatening; therefore,

we need an explanation for this potentially disruptive behavior.

(Defs.' Opp'n, Ex. A.)

On March 19, Williams responded by giving his version of events related to patient WP, explaining that airway management issues with this patient were unexpected, and likely due to bleeding in the upper airway and an enlarged epiglottis.[3] (Defs.' Opp'n, Ex. B.) Williams also suggested the surgery team was unexpectedly slow in establishing the surgical airway, as they made three unsuccessful attempts at placing the tube. (*Id.*)

As to the hotline issue, Williams identified two possible events that may have resulted in a hotline complaint. According to Williams, the first event occurred when a patient was returned to the room, and Williams was manually ventilating the patient with an ambu bag. (*Id.*) Williams was ventilating with one hand while trying to work the ventilator controls with the other, until the respiratory therapist arrived. (*Id.*) Williams wrote that when he saw the respiratory therapist in the hallway, he asked the nurse to suction the tracheostomy tube while he briefly stepped to the door to speak with the respiratory therapist. (*Id.*) According to Williams, the nurse became agitated and indicated Williams had left the patient unventilated. (*Id.*) Williams stated the respiratory therapist was at the ventilator within seconds, and Williams asked the nurse whether she considered ventilating patients with an ambu bag part of her job. (*Id.*) Williams contends he never left the room, and the patient never was in danger. (*Id.*)

Williams identified as a second possible hotline call an incident in a recovery room where Williams walked seven feet from the

---

**3.** A cartilaginous structure that covers the opening at the upper part of the larynx during swallowing.

patient's bed to wash his hands. (*Id.*) According to Williams, the nursing supervisor asked why Williams left the patient for her to ventilate. (*Id.*) Williams wrote that he believed the nurse was joking, as she said it in a joking manner and the respiratory therapist was standing directly behind Williams prior to Williams leaving the patient's bedside.[4] (*Id.*)

With respect to the incident with Voss, Williams wrote that he called the hotline regarding the incident with the ambu bag and Liebrader. (*Id.*) According to Williams, Voss's response that the peer review process is shielded from discovery caught him off guard, and he may have "overreacted" to the situation. (*Id.*) He denied being threatening or rude to the staff at any time. (*Id.*) Williams explained he did not dictate a complaint or response because he considered Liebrader's complaint "bogus." (*Id.*)

On March 21, Dr. Della Ming Lin ("Lin") of the Greeley Company produced an external peer report reviewing the incident with patient WP. (Defs.' Opp'n, Ex. M.) The report raised various potential issues with Williams' care of patient WP, including some questions regarding documentation; the rationale for using a muscle relaxant; if a muscle relaxant was given, why was the patient able to cough; and why certain non-surgical emergency intubation devices were not used while awaiting the surgical airway to be placed. (*Id.*) Additionally, the Greeley report criticized certain steps taken in the resuscitation efforts, including the large dose of epinephrin given and the lack of atropine administered as would be expected as part of the ACLS protocol. (*Id.*)

The MEC held a meeting on March 22 at which it considered Williams' suspension. (Pl.'s MSJ, Ex. N at 2.) On March 24, Ellerton sent Williams a letter notifying Williams that the MEC had decided to continue his suspension, but the letter contained no reasons supporting the MEC's decision. (Defs.' Opp'n, Ex. D; Pl.'s Mot., Ex. T at 102–03.) The letter stated the MEC would reconsider its decision only if Williams underwent a comprehensive evaluation by the Nevada Health Professionals Assistance Foundation ("Foundation"), which is a physician's health program under contract with the Nevada State Medical Board to serve as a diversion from discipline. (*Id.*) If Williams underwent the evaluation, the MEC would re-assess whether to continue the suspension or take other action. (*Id.*) If Williams failed to undergo the evaluation, the MEC would proceed to consider revoking Williams' privileges. (*Id.*) Ellerton advised Williams of his right to a Fair Hearing, including his right to represent himself at the hearing or be represented by another; his right to call, examine, and cross-examine witnesses, and to present evidence; and to submit a written statement at the close of the hearing. (*Id.*)

In addition to suspending him, UMC made a report to the National Practitioner Data Bank ("NPDB") stating Williams' privileges at UMC were suspended and gave as the reasons the following:

> At the completion of a kidney transplant, for which Dr. Williams was providing anesthesia, Dr. Williams extubated a patient whose airway was not secure. Dr. Williams could not re-intubate the patient, the patient arrested and was resuscitated, by the surgical team, only after an emergency chricothyroidotomy was performed. The patient suffered significant anoxic brain injury. Dr. Williams was, at the time,

---

4. Defendants did not pursue this second incident as a charge related to Williams' suspension.

being reviewed because of concerns about his airway management skills in other recent cases.

(Pl.'s Mot. for Partial Summ. J. Re: Constitutionality of 42 U.S.C. § 11133 (Doc. # 35), Ex. F.) As a result of this report, two other hospitals subsequently suspended Williams' privileges. (*Id.*, Exs. H, I.)

Williams requested a Fair Hearing and the hearing initially was set for April 21. (Defs.' Opp'n, Exs. E, N.) However, Williams thereafter retained an attorney and requested the Fair Hearing be rescheduled. (Pl.'s Mot., Ex. C.) Defendants agreed to move the hearing date. (Pl.'s Mot., Ex. D.) Defendants' counsel also indicated that it "might be possible to avoid a Fair Hearing altogether if you would convince Dr. Williams to acquiesce to the recommendations" of the MEC. (*Id.*)

Williams' counsel responded by requesting details on precisely what the evaluation would entail as well as "the basis for the Committee's request that Dr. Williams submit to this evaluation." (Pl.'s Mot., Ex. E at 2.) Counsel further requested a "detailed explanation and disclosure of the allegations [which] have been lodged," as well as various documents underlying the MEC's decision, including patient records and Williams' performance improvement file. (*Id.* at 2–4.) Counsel also requested "[a]ny pharmacy records, Pyxis printouts, drug wastage reports, which may be used or reviewed by the Committee in its consideration of Dr. Williams' privileges." (*Id.* at 3.)

Defendants' counsel responded by stating "the only issue before the hearing panel ... is whether the Medical Executive Committee's action against Dr. Williams was in furtherance of quality health care, based on his competence or professional conduct, which conduct may adversely affect the health or welfare of patients and which may adversely affect his clinical privileges." (Pl.'s Mot., Ex. F

at 1.) Counsel explained that the purpose of the evaluation by the Foundation would be to "determine whether Dr. Williams is an impaired physician." (*Id.*) Counsel declined to provide information considered by the MEC in reaching its decision or any information the MEC would consider in preparation for the Fair Hearing, including any pharmacy records or Pyxis reports, stating such records were confidential. (*Id.* at 2–3.) Counsel advised how Williams could obtain the complete medical file of patient WP, and how he could access his personnel file and the NPDB report. (*Id.* at 2–4.)

Williams' counsel wrote several letters further requesting documents or requesting confirmation that those documents would not be used to support charges against Williams at the Fair Hearing. (Pl.'s Mot., Exs. G, H.) Williams' counsel also expressed concerns with Defendants' NPDB report, specifically the indication that at the time of the incident with patient WP, Williams was under investigation for airway management issues in other cases. (*Id.* at 1.) Counsel requested Defendants identify these other cases of airway management issues, provide the associated medical records, and identify how Williams allegedly breached the applicable standard of care. (*Id.*) Counsel further indicated that if there were no such other cases, that Defendants immediately amend the NPDB report to show the WP incident was the only basis for the investigation and suspension. (*Id.* at 2.) With respect to the NPDB report, Defendants' counsel responded by stating, "I am in the process of following up on the Data Bank report issue." (Pl.'s Mot., Ex. J.)

Williams' counsel thereafter challenged Defendants' invocation of a privilege for the materials relied upon by the MEC and sought confirmation that Williams' performance improvement file was empty.

(Pl.'s Mot., Exs. K, L.) Defendants' counsel confirmed the performance improvement file was empty. (Pl.'s Mot., Ex. M.)

Williams counsel thereafter demanded that the suspension be revoked and the report to the NPDB be rescinded. (Pl.'s Mot., Ex. N.) Williams' counsel contended Williams received no notice prior to his summary suspension as to what conduct posed an immediate danger to patients or staff at UMC. (*Id.* at 1.) Rather, Williams contends the first notice of the charges was Ellerton's March 15 letter, which identified three issues: (1) the WP incident; (2) premature extubation of patients as reported on the hotline; and (3) Williams' interaction with Voss regarding the complaint against him. (*Id.*) Counsel noted that the letter made no mention of substance abuse. (*Id.* at 2.) Counsel further argued that although the MEC decided to continue the suspension, it expressed no concern with Williams' clinical competence nor recommended further training. (*Id.*) Rather, the MEC required Williams to submit to an evaluation by the Foundation "despite the lack of any reasonable basis to conclude that the doctor has a substance problem." (*Id.*) Williams was reluctant to agree to this requirement, as it would brand him as a drug abuser. (*Id.*) Williams further indicated he had undergone drug tests, each of which was negative, and underwent a fitness exam by a psychiatrist who found no psychological issues rendering Williams unfit to practice. (*Id.* at 3.) Williams again objected to the NPDB report. (*Id.*)

Defendants' counsel responded to Williams' argument that he had no notice as to the conduct justifying his suspension by contending that Ellerton had spoken to Williams by phone on March 7 to inform Williams he was being suspended due to the incident with patient WP. (Pl.'s Mot., Ex. O at 1.) Thereafter, Ellerton requested an independent evaluation by the Greeley

Company, and asked Williams to provide a written response to the charges. (*Id.*) Defendants' counsel wrote that "[w]hile neither the March 7, 2005, nor the March 15, 2005 letter mentions a concern about substance abuse . . ., during the course of the investigation, substance abuse became a concern as a possible explanation for Dr. Williams' behavior and conduct." (*Id.* at 2.)

As to Williams' argument that the MEC had no concerns with his skills or competence, Defendants' counsel responded that a "reasonable person could conclude" that the MEC would not have voted to continue Williams' suspension unless it was concerned about Williams' skill and competence. (*Id.*) Counsel contended that by voting to continue the suspension, the MEC necessarily had concerns about Williams' skill and competence. (*Id.* at 2–4.)

As to the requirement of an evaluation by the Foundation, Defendants' counsel stated that Williams' conduct triggered a concern that he was impaired, and the evaluation would be directed not only at substance abuse, but also whether Williams was suffering from any emotional or physical distress. (*Id.* at 3.) With respect to the NPDB report, counsel stated "I am still attempting to follow up on the phrase in the report about 'other recent cases.' " (*Id.*)

The Fair Hearing ultimately was set for September 20. (Pl.'s Mot., Ex. R.) On September 9, Ellerton advised Williams of the list of witnesses who would appear at the Fair Hearing. (Defs.' Opp'n, Ex. Q.) The day of the hearing, Defendants' counsel faxed Williams' counsel an additional exhibit to be used in that evening's Fair Hearing, which was Williams' application for credentials at UMC. (Pl.'s Mot., Ex. S.)

At the hearing, Liebrader testified regarding the incident with the ambu bag.

(Pl.'s Mot., Ex. T at 29–66.) Voss testified regarding Williams' demeanor in calling the hotline. (*Id.* at 83–100.) Lin testified regarding her concerns with Williams' care of the patient WP, as expressed in the Greeley report. (*Id.* at 161–232.) Shen testified about the events during the procedure with patient WP. (*Id.* at 258–98.) Doctor Peter Mansky ("Mansky") testified regarding the Foundation's services and Mansky's conversations with Williams regarding Williams' possible evaluation by the Foundation. (*Id.* at 102–25.) Mansky testified that he had described the program to Williams, but Williams indicated he was not interested. (*Id.* at 109–110.)

Additionally, Ron Pimentel ("Pimentel"), Director of Operating Room Services at UMC, testified that in late February 2005, two nurses came to him to report Williams' behavior in asking them to witness narcotics wastage after the patient had left the room. (*Id.* at 126–58.) Pimentel explained that when a drug is left over and not entirely used for the patient, the wasting of that narcotic should be wasted in front of witnesses before the patient leaves the room. (*Id.* at 130–31.) UMC has an automated drug wastage program into which wastage reporting is recorded and printed. (*Id.* at 132.) Pimentel discussed this policy with Williams in response to the nurses' concerns. (*Id.* at 133.) According to Pimentel, Williams stated he was unfamiliar with UMC's system, and perhaps that led to the issue. (*Id.* at 133–34.) The charts were reviewed, and no discrepancies in the narcotics dispensed versus the amount used were uncovered. (*Id.* at 140–41.) After that incident, Pimentel was unaware of any other incidents of narcotics wastage policy violations by Williams. (*Id.* at 134.)

Williams presented Dr. Nathan Lavid ("Lavid"), who testified regarding his psychiatric evaluation of Williams, as well as the hair and urine drug tests he performed on Williams. (Pl.'s Mot., Ex. U at 239–58.) According to Lavid, he took a hair sample from Williams on April 11, which tested negative for drugs. (*Id.* at 243–44.) Lavid also found no major mental illness. (*Id.* at 224–45.) Lavid testified no psychological conditions rendered Williams unfit to practice. (*Id.* at 245.)

Williams also testified about various topics, including why he did not want to participate in the diversion program with the Foundation. (*Id.* at 312.) Specifically, Williams was willing to undergo an evaluation, but was not willing to sign up for a multi-year probationary period when he had not abused drugs as suggested. (*Id.* at 315–16.) Williams denied he ever has used illegal drugs. (*Id.* at 389.) Williams also gave his version of events in the care of WP, the ambu bag incident, and the narcotics wastage incidents. (*Id.* at 319–77, 389–404.) During Williams' testimony, Ellerton questioned Williams about Williams' alleged failure to put on his credentials application with UMC that he had been dismissed from a residency program due to a lack of experience in dealing with emergent care and acute care problems. (*Id.* at 303–06, 397–99.) Ellerton also asked Williams about whether he notified UMC that he was suspended at other hospitals following UMC's report to the NPDB. (*Id.* at 306–10.)

On September 23, the Fair Hearing Committee issued its decision. (Defs.' Opp'n, Ex. R.) According to the Fair Hearing Committee's written decision, it heard evidence on the following issues:

1. Wasting of narcotics after the patient has left the room (Pyxis System Policy violation).

2. Disconnecting of ambu bag from patient before ventilator is ready, leaving the room briefly, and not giving nurse clear direction so that she could understand her role.

3. Adverse outcome on patient receiving anesthesia for renal transplant. The patient awakened prior to full completion of the procedure and was extubated by [Williams] without ensuring the patient's ability to breathe spontaneously. The patient could not ventilate properly on his own, [Williams] was unable to reestablish an airway and instead paralyzed the patient with a medium acting agent. The patient required an emergency surgical airway. The patient sustained anoxic brain damage and a cardiac arrest requiring CPR, which was successful. The patient continues to suffer the sequelae of anoxic brain damage.

(*Id.*)

Based on the evidence presented, the Fair Hearing Committee found that the MEC acted appropriately in suspending Williams based on the incidents and based on Williams' "decision not to participate in the Diversion Program assessment." (*Id.*) Additionally, the Fair Hearing Committee determined that based on the wasting of narcotics incident, "the possibility of substance abuse was a legitimate concern that needed to be addressed." (*Id.*) The Committee further found that with respect to the ambu bag incident, it was Williams' responsibility to ensure a ventilation plan was understood by all participants, and that he demonstrated poor judgment in disconnecting the bag and leaving the room without ensuring continued ventilation of the patient. (*Id.*) In relation to the incident with patient WP, the Committee determined the level of anesthesia was too light at the end of the procedure and Williams failed to maintain an airway in the patient. (*Id.*) The Committee thus found Williams' skill and competency in emergency airway management and ACLS protocol were substandard but that he had the ability to improve. (*Id.*)

The Fair Hearing Committee recommended that Williams' privileges be revoked, but that the revocation be stayed if Williams successfully underwent an evaluation by the Foundation, underwent additional airway management and ACLS training, and critically reviewed his judgment in the ambu bag incident. (*Id.*) Upon completing these requirements, Williams would have to undergo a monitorship under another anesthesiologist, the suspension would be stayed for two years with a zero tolerance policy, and during the two-year period, the MEC could order random drug testing. (*Id.*) Any violation of these terms would lead to immediate revocation of privileges. (*Id.*)

On November 3, 2005, the MEC issued its ruling accepting the recommendations of the Fair Hearing Committee. (Pl.'s Mot., Ex. V.) Williams appealed the MEC's decision to the Board of Trustees. (Defs.' Opp'n, Ex. Y; Pl.'s Mot., Ex. W.) The Board affirmed the MEC's findings and recommendations in February 2006. (*Id.*)

Williams brought suit in this Court on March 23, 2009. (Compl. (Doc. # 1).) In his Amended Complaint, Williams sues Defendants UMC, UMC's Board of Trustees in their official capacities, the Medical Staff, and Ellerton. (Am. Compl. (Doc. # 30).) Williams asserts against Defendants, among other claims, a claim for due process violations under the United States Constitution (count one). Williams also brought suit in state court, which held on November 10, 2009, that—

the decision of the Clark County Board of Commissioners to uphold the Medical Executive Committee's ("MEC") summary suspension of the Plaintiff's hospital privileges and its related actions, and the Fair Hearing Committee's decision to uphold the summary suspension of the Plaintiff's privileges, and its related actions, were not arbitrary or capricious

and were clearly supported by substantial evidence in the record.

(Supp. to Defs.' Opp'n to Pl.'s Mot. for Partial Summ. J. (Doc. # 84), Ex. 2.)

Williams now moves for summary judgment on his due process claim. Defendants oppose the motion, and also move for summary judgment on the issue of immunity under federal law.

## II. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if it might affect the outcome of a suit, as determined by the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the nonmoving party. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). Initially, the moving party bears the burden of proving there is no genuine issue of material fact. *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002). After the moving party meets its burden, the burden shifts to the non-moving party to produce evidence that a genuine issue of material fact remains for trial. *Id.* The Court views all evidence in the light most favorable to the non-moving party. *Id.*

## III. WILLIAMS' MOTION FOR SUMMARY JUDGMENT (Doc. # 53)

Williams moves for summary judgment on his due process claim (count one), arguing Defendants acted under color of state law, his hospital privileges are a property right, and Defendants denied him due process by failing to provide him adequate notice of the charges against him and by failing to provide him with documentation to permit him to defend himself. Williams further argues that because Defendants failed to provide him with procedural due process, Defendants have no entitlement to qualified immunity under the Health Care Quality Improvement Act of 1986 ("HCQIA"). Defendants oppose the motion, conceding that Plaintiff has a property interest in his privileges, but denying Defendants acted under color of state law and arguing that, in any event, they provided him notice and an opportunity to be heard. Defendants also argue they are entitled to immunity under the HCQIA.

■ To establish liability under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law. *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir.2003). The Fourteenth Amendment's due process clause also requires state action. U.S. Const., XIV amend. (". . . nor shall any State deprive any person of life, liberty, or property, without due process of law"). The Fourteenth Amendment's "state action" requirement is the same as § 1983's "under color of law" requirement. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 929, 935, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). Where the claim is an alleged procedural due process violation, the plaintiff must demonstrate "(1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Kildare v. Saenz*, 325 F.3d 1078, 1085 (9th Cir.2003).

### A. Under Color of State Law

■ A defendant acts under color of law if he "exercise[s] power possessed by virtue of state law and made possible only

because the wrongdoer is clothed with the authority of state law." *West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (quotation omitted). "Action under color of state law normally consists of action taken by a public agency or officer." *Taylor v. First Wyo. Bank, N.A.,* 707 F.2d 388, 389 (9th Cir.1983).

However, under some circumstances, private individuals may be liable as governmental actors. *See Kirtley v. Rainey,* 326 F.3d 1088, 1092 (9th Cir.2003); *Morse v. N. Coast Opportunities, Inc.,* 118 F.3d 1338, 1340 (9th Cir.1997). Conduct by a private individual constitutes state action when (1) the claimed deprivation " 'resulted from the exercise of a right or privilege having its source in state authority,' " and (2) under the facts of the particular case, the private party appropriately may be characterized as a state actor. *Villegas v. Gilroy Garlic Festival Ass'n,* 541 F.3d 950, 954–55 (9th Cir.2008) (quoting *Lugar,* 457 U.S. at 939, 102 S.Ct. 2744). " '[T]here is no specific formula for defining state action.' " *Sutton v. Providence St. Joseph Med. Ctr.,* 192 F.3d 826, 836 (9th Cir.1999) (quoting *Howerton v. Gabica,* 708 F.2d 380, 383 (9th Cir.1983) (citation and internal quotation marks omitted)). Rather, a court should look to whether a sufficiently close nexus between the state and the challenged conduct exists to fairly attribute the conduct to the state. *Id.* The inquiry is fact specific. *Id.*

### 1. Defendant Board of Trustees

The Board of Trustees are state actors because they act as the county hospital's Board of Trustees in their capacity as County Commissioners, and derive their authority to do so by state law. Nevada law provides that in any county with a population exceeding 400,000, the board of county commissioners is the board of the trustees for the county's public hospital. Nev.Rev.Stat. § 450.090. The Board in this case consists of the Clark County Commissioners who approve the UMC Bylaws and review the MEC's final decisions. *Id.* § 450.160 (requiring board of trustees to make and adopt bylaws, rules, and regulations for government of the hospital, including rules governing the admission of physicians to the staff). Defendants concede the Board is a state actor in their own motion for summary judgment. (Defs.' Mot. Summ. J. (Doc. # 63) at 15.)

### 2. Defendant UMC

Defendant UMC is a state actor, as it is a public county hospital created through a petition signed by a certain percentage of taxpayers and approved by the board of county commissioners, and is supported through taxpayer funds. Nev.Rev.Stat. § 450.020–.060. Nevada law requires the Board to budget the hospital as it would for any other government agency. *Id.* § 450.230 ("The board of hospital trustees shall file with the board of county commissioners a budget as required of all government agencies of this state...."). Further, "[a]ll money received for the hospital must be deposited in the county treasury...." *Id.* § 450.250(3). In their own motion for summary judgment, Defendants concede UMC is a state actor. (Defs.' Mot. Summ. J. (Doc. # 63) at 15.)

### 3. Defendant Medical Staff

The Medical Staff is created by virtue of Nevada statute and through action by the County Commissioners acting as the Board. By law, the hospital's board of trustees "shall organize a staff of physicians composed of each regular practicing physician, podiatric physician and dentist in the county in which the hospital is located who requests staff membership and meets the standards set forth in the regulations prescribed by the board of hospital trustees." Nev.Rev.Stat. § 450.440(1). Nevada law also requires the staff to "or-

ganize in a manner prescribed by the board so that there is a rotation of service among the members of the staff to give proper medical and surgical attention and service to the indigent sick, injured or maimed who may be admitted to the hospital for treatment." *Id.* § 450.440(2). Pursuant to this authority, the Board approved UMC's Bylaws, which created the Medical Staff. (Pl.'s Mot., Ex. X at 2.) Through the Bylaws, the Board has delegated to the Medical Staff much of its administration and oversight duties over the public hospital and the physicians who practice there. The organization itself is comprised mostly of individual private physicians, but a mix of private individuals and state officials dominate the organization's decision making. The private physicians serve on the MEC; however, final policy and decision making power rests in the Board, a governmental body.

The Nevada Supreme Court has discussed a public county hospital's staff as follows:

> The purpose of the community hospital is to provide patient care of the highest possible quality. To implement this duty of providing competent medical care to the patients, it is the responsibility of the institution to create a workable system whereby the medical staff of the hospital continually reviews and evaluates the quality of care being rendered within the institution. The staff must be organized with a proper structure to carry out the role delegated to it by the governing body. All powers of the medical staff flow from the board of trustees, and the staff must be held accountable for its control of quality.

*Moore v. Bd. of Trustees of Carson–Tahoe Hosp.*, 88 Nev. 207, 495 P.2d 605, 608 (1972). The Nevada Supreme Court thus has recognized that a county hospital's staff has delegated authority from the Board, and has powers which "flow" from the Board. An individual physician simply being a member of the staff does not thereby become a state actor. However, the Medical Staff as an organization exercising the delegated powers that "flow" from the Board is a state actor, as it was created by state action, derives its authority to perform certain tasks through state action, and performs tasks delegated from a state actor to fulfill a public purpose.

The United States Court of Appeals for the Tenth Circuit reached a similar conclusion in *Milo v. Cushing Municipal Hospital*, even though there the actor who suspended the physicians was nominally a private party. In *Milo*, the city owned the hospital but leased it to the "Authority," a public trust created pursuant to Oklahoma law. 861 F.2d 1194, 1195 (10th Cir.1988). The Authority entered into an operating agreement with a private corporation to manage the hospital, including handling medical staff privileges. *Id.* The hospital summarily suspended two doctors, who then sued the hospital under § 1983. *Id.* The defendants argued there was no state action because the private corporation suspended the doctors, not the city or the Authority. *Id.*

The Tenth Circuit concluded that the Authority—

> "cannot benefit from private management of the hospital and at the same time insulate itself from liability for [a violation of section 1983] by that manager. The private defendants cannot receive public funds, utilize public facilities, and serve a public purpose, yet insist that their private status forestalls any connection of a violation of the constitutional rights of their medical staff."

*Id.* at 1197 (quoting *Jatoi v. Hurst–Euless–Bedford Hosp. Auth.*, 807 F.2d 1214, 1221–22 (5th Cir.1987)). The Tenth Circuit concluded the "defendants cannot escape liability by delegating responsibility

to another party." *Id.* The Tenth Circuit thus held the hospital was a public institution and its suspension of the doctors' privileges was state action. *Id.; see also Mealand v. E. N.M. Med. Ctr.,* 131 N.M. 65, 33 P.3d 285, 293–94 (2001) (holding that plaintiff raised a genuine issue of material fact that medical center was a state actor where county created it pursuant to New Mexico statutory authority and the medical center's management "necessarily derived its authority to make personnel decisions through a delegation of authority by Chaves County").

The Medical Staff is created through the Bylaws, which are promulgated by the Board pursuant to Nevada statute. The Medical Staff carries out certain functions of public hospital administration, including as relevant here, the initial investigation and determination regarding suspension and/or revocation of physician privileges at the public hospital. Through the Bylaws, the Board created the Medical Staff to act in this capacity, and the Medical Staff is carrying out the government function of regulating physician privileges at a public hospital through this delegated authority.[5] The state cannot escape liability for § 1983 liability by delegating its authority to another entity and then disclaiming state action.[6]

### 4. Defendant Ellerton

While state employment generally suffices to render the defendant a state actor, it is not required. *Nieto v. Kapoor,* 268 F.3d 1208, 1215–16 (10th Cir.2001). A contractual relationship between the state and the individual may suffice because it is "the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State." *Id.* (quotation omitted).

■■■ Ellerton was the Chief of Staff, and pursuant to the Bylaws, he was head of Defendant Medical Staff. He was the individual who summarily suspended Williams under powers delegated to him under the Bylaws, sent Williams all relevant notices on UMC letterhead, and presented the evidence against Williams at the Fair Hearing.

Other courts have held physicians were state actors in similar circumstances. For example, in *Faucher v. Rodziewicz,* the United States Court of Appeals for the Eleventh Circuit held that where a public hospital's bylaws delegated the hospital's management to an executive director, that director's actions were integrally involved in the management and administration of the public hospital and thus his acts constituted state action. 891 F.2d 864, 868 (11th Cir.1990); *see also Malak v. Assoc. Physicians, Inc.,* 784 F.2d 277, 281–82 (7th Cir. 1986) (holding plaintiff presented sufficient evidence to survive summary judgment against public hospital, its head administrator, and private entity which contracted with public hospital to operate its emergency room, as all actors were state actors, either by status as a public hospital and its head administrator, or as private actor acting jointly with public hospital in termi-

---

**5.** Additionally, in opposition to Defendants' motions for summary judgment, Williams has presented evidence the county pays for Defendant Medical Staff's attorney's fees, and Medical Staff uses the services of the District Attorney. (Pl.'s Opp'n to Defs.' Mot. Summ. J. (Doc. # 70), Exs. H, I.) To justify payment of these fees, Kathleen Silver, CEO of UMC, cited to Nevada Revised Statutes § 41.0339, which provides that the District Attorney

"shall provide for the defense ... of any present or former officer or employee of the State or a political subdivision." (*Id.,* Ex. H.)

**6.** For these reasons, the Court disagrees with the result in *Chudacoff v. UMC, et al.,* which ruled the Medical Staff was not a state actor under similar circumstances. (2:08–CV–00863–ECR–RJJ, Order (Doc. # 229) at 23.)

nating physician). As the Fifth Circuit has stated,

> There is no question that when those in charge of the affairs of a public hospital deal with staff members, patients or would-be patients, the dealings must conform to the requirements and prohibitions of the fourteenth amendment. And, if the authorities of a public hospital, acting under color of law, deprive a person of a federally protected right, he may seek redress under § 1983.

*Briscoe v. Bock*, 540 F.2d 392, 394–95 (8th Cir.1976).

Ellerton is UMC's Chief of Staff and he acted as head of the MEC, the administrative body of the Medical Staff, which itself is an entity created through the Bylaws adopted by the Board as required by Nevada law, and which derives its authority from state law and the Board's actions in delegating its authority to the MEC. Ellerton derived his authority to summarily suspend Williams from authority delegated by the Board, and thus his conduct constitutes state action.[7]

Defendants argue that in two other cases in this District, *Chudacoff v. UMC, et al.* and *Tate v. University Medical Center of Southern Nevada*, have held Ellerton is a private actor under similar circumstances. *Chudacoff* held the individual doctor defendants, including Ellerton, were private actors, and the plaintiff's reliance on the Bylaws and delegation of authority through those Bylaws was insufficient to show anything other than that the doctors were members of the MEC. (*Chudacoff v. UMC, et al.*, 2:08–CV–00863–ECR–RJJ, Order (Doc. # 229) at 22–23.) However, as acknowledged by Defendants at the hearing conducted on December 21, 2009, *Tate* held only that the plaintiff failed

to state any action Ellerton took to deprive the plaintiff of any right, that is, Ellerton lacked personal participation in any deprivation of a constitutional right. *Tate v. Univ. Med. Ctr. of S. Nev.*, 637 F.Supp.2d 892, 897 (D.Nev.2009). *Tate* did not rule on whether Ellerton was a state actor. For the reasons stated above, the Court disagrees with the result in *Chudacoff* as to Ellerton's status as a state actor when acting as Chief of Staff exercising authority delegated from the Board.

### B. Due Process Violation

#### 1. Property Interest

■ Nevada has recognized the "right to enjoy medical staff privileges in a community hospital," although it characterized this right as non-absolute and subject to the hospital's reasonable rules and regulations. *Moore*, 495 P.2d at 607–08 (evaluating doctor's substantive due process claim arising out of suspension of privileges); *see also Chudacoff v. Univ. Med. Ctr. of So. Nev.*, 609 F.Supp.2d 1163, 1172 (D.Nev. 2009) (holding physician's privileges is a constitutionally protected property right). Consequently, Nevada law recognizes hospital privileges as a state-protected property interest.

#### 2. Adequacy of the Procedural Protections

■ Due process requires notice and an "opportunity to be heard at a meaningful time and in a meaningful manner." *Miranda v. City of Cornelius*, 429 F.3d 858, 866–67 (9th Cir.2005) (quotation omitted). To determine whether the procedures provided are adequate, the Court must "balance (1) the private interest affected by the official action; (2) the risk of erroneous

---

**7.** Additionally, in opposition to Defendants' motions for summary judgment, Williams has presented evidence that the county pays Defendant Ellerton's attorney's fees with the

same justification listed above with respect to Defendant Medical Staff, i.e., that he is an employee of a political subdivision of the state.

deprivation and the probable value of additional procedural safeguards; and (3) the governmental interest, including the fiscal and administrative burdens of additional procedures." *Humphries v. County of L.A.*, 554 F.3d 1170, 1193 (9th Cir.2009) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). The inquiry is case specific, and depends on the totality of the circumstances. *Id.*

### a. Defendants' Procedures

Under Article XI of the Bylaws, if a physician with privileges at UMC engages in any behavior that "is likely to be detrimental to patient safety or to the delivery of quality patient care," any member of the UMC staff may initiate a routine administrative action against that physician. (Pl.'s Mot., Ex. X at 32–33.) If the physician's conduct "requires that immediate action be taken to protect the life of any patient(s) or to reduce the substantial likelihood of injury or damage to the health or safety of any patient," the Chief of Staff may summarily suspend the physician's privileges. (*Id.* at 33.) The summary suspension may last no more than thirty days or until the next regularly scheduled MEC meeting. (*Id.*) The Bylaws require the physician be given "prompt special notice." (*Id.*) The Bylaws do not define "special notice," but a summarily suspended physician is entitled to the procedural protections in the Fair Hearing Plan, and the Fair Hearing Plan defines it as "written notification sent by certified or registered mail, return receipt requested." (Pl.'s Mot., Ex. X at 33, Ex. Y at 3.) Pursuant to Article XII of the Bylaws, a complaint against a physician must be in writing and submitted to the Medical Staff Office, which will then forward the correspondence to the appropriate Department Chief. (*Id.* at 35.) The physician "must be notified and granted access to any materials relevant to that incident." (*Id.*)

The Fair Hearing Plan sets forth the applicable procedures in the event an adverse action is taken against a physician, including suspension. (Pl.'s Mot., Ex. X at 35, Ex. Y at 3.) Pursuant to Article II of the Fair Hearing Plan, the Chief of Staff promptly must give the physician special notice that an adverse recommendation or action has been taken. (*Id.* at 3.) The notice must advise the physician, among other things, "of the adverse recommendation or action, [and] of the ground upon which the recommendation or action is based." (*Id.*) The notice must be sent by certified or registered mail, return receipt requested. (*Id.*) The physician then has thirty days to request a Fair Hearing. (*Id.*)

The Fair Hearing normally must be held within thirty days of the physician's request, but the physician can waive this time limit. (*Id.* at 4.) The hearing is held by an ad hoc committee of five physicians appointed by the Chief of Staff. (*Id.*) The physician may represent himself at the hearing, and may be represented by any other person, including a licensed attorney. (*Id.* at 5.) The physician has the right to call, examine, and cross-examine witnesses, however if the physician is represented by a licensed attorney, the attorney may not cross-examine witnesses, although the physician or any other representative of the physician may do so. (*Id.* at 5.) The hearing is informal, is not governed by the rule of law on the admissibility of evidence, and "[a]ny relevant matter upon which responsible persons customarily rely in the conduct of serious affairs may be considered." (*Id.*) When a physician is suspended, he bears the burden of proving, by clear and convincing evidence, that the adverse action or recommendation lacks any substantial factual basis or that the basis or the conclusions drawn therefrom are either arbitrary, unreasonable, or capricious. (*Id.*)

Within twenty days from the hearing, the Fair Hearing panel must issue its decision to the MEC. (*Id.* at 6.) Within ten days, the MEC must review the decision and decide whether to affirm, modify, or reverse its original recommendation. (*Id.*) The physician may be present at this meeting and argue for what the appropriate decision should be. (*Id.*) If the decision is adverse to the physician, the MEC must notify the physician of his right to appeal to the Board of Trustees. (*Id.* at 6.) The physician may appeal to the Board within thirty days. (*Id.* at 7.) The Board shall not substitute its judgment for that of the MEC or the Fair Hearing Committee as to the weight of the evidence on questions of fact. (*Id.* at 8.) The Board may reject or modify the MEC's decision if it is clearly erroneous in view of the evidence in the record as a whole. (*Id.*) The Board's decision is final. (*Id.*)

### b. Adequacy of the Procedures

The private interest affected by the official action is the ability to practice medicine at a particular location, UMC. While privileges at a particular hospital may seem a relatively minor private interest, the interest "extends further, however, in that a suspension of privileges at one hospital, when reported to the NPDB, could limit a physician's ability to practice anywhere in the country. The amount of process must accord sufficient respect for a professional's life and livelihood." *Chudacoff*, 609 F.Supp.2d at 1173. The government interest at stake is controlling the quality of care physicians provide at a public hospital, particularly where a risk to patients is identified.

The risk of erroneous deprivation is substantial. Because hospitals report suspensions to the NPDB, "an improper suspension would have dramatic consequences for the physician," who may be unable to practice nationwide based on a mistaken report. *Id.* Additionally, the NPDB is a less effective resource and does not serve its purpose in protecting the public if it is likely to receive erroneous reports on physicians. *Id.* "As a result, there are substantial benefits to having procedural safeguards in place to protect both the physician and the NPDB from erroneous or improper reporting." *Id.* "Both are best served by having the safeguards in place on the front-end of the decision-making process; neither is served by remedial provisions. Once the damage is done, it is hard to undo." *Id.*

Williams does not challenge the procedures set forth in the Bylaws and Fair Hearing Plan themselves as inadequate. Rather, Williams contends Defendants failed to follow those procedures.

### i. Summary Suspension

Williams argues Defendants did not provide him with adequate notice of the charges related to his summary suspension because the suspension letter did not set forth the reasons for the summary suspension and did not state why there was a substantial likelihood of injury or damage to the health or safety of a patient to support the summary suspension. Defendants respond that the Bylaws permit summary suspension and Ellerton contacted Williams by phone and told him about the suspension, as well as sending the suspension letter. Further, Ellerton sent another letter eight days later advising Williams of the MEC meeting and setting forth three areas of discussion.

Usually, notice and an opportunity to be heard must occur before a deprivation. *Chalkboard, Inc. v. Brandt*, 902 F.2d 1375, 1380 (9th Cir.1989). However, the exigencies of the government interest at stake in protecting patients from immediate harm posed by a physician who represents a danger of such harm may not allow for pre-deprivation notice and an opportunity to be heard. In cases where the state

by necessity must act quickly or it is impractical to provide meaningful pre-deprivation process, the availability of meaningful post-deprivation process may satisfy due process. *Hudson v. Palmer*, 468 U.S. 517, 531–32, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).

Under the Bylaws, a summarily suspended physician will have his suspension reviewed either within thirty days or at the next regularly scheduled MEC meeting. Consequently, there is relatively prompt post-deprivation review. The Bylaws do not require the summary suspension to include the reasons for the suspension or the reasons for a finding of immediate threat of patient harm. However, a summarily suspended physician is entitled to the protections of the Fair Hearing Plan. The Fair Hearing Plan requires the Chief of Staff to give "special notice" which must advise the physician "of the adverse recommendation or action, [and] of the ground upon which the recommendation or action is based."

If the suspension letter does not detail the bases for the suspension, the physician may not have a meaningful opportunity to prepare for the MEC meeting because he lacks sufficient information regarding the charges against him. Because there is no pre-deprivation notice or opportunity to be heard, and a lack of specificity in the suspension letter could hamper the physician's ability to obtain meaningful post-deprivation review, due process requires the state actor to set out the required findings supporting the summary suspension and the basis therefore, as the Fair Hearing Plan requires. Requiring this procedural protection is of little to no burden on the government, as the Chief of Staff is required to make these findings to impose a summary suspension in the first place. Adding them to the letter of suspension is of little additional burden and ensures the Chief of Staff has made the

required findings supporting the summary suspension, thus lessening the risk of an erroneous deprivation.

■ Here, the summary suspension letter says nothing about why Williams was being suspended, does not state Williams' immediate suspension was required to protect patient safety, and does not provide a reason for such a finding. As to the phone conversation in which Ellerton advised Williams of his summary suspension, the only evidence presented related to that conversation was Williams' testimony that Ellerton called and told him he was being suspended for his conduct in the WP case. There is no evidence Ellerton advised Williams what specifically about his conduct in the WP case was being challenged, and why that led to a finding of the need for a summary suspension to protect patients. Moreover, the Fair Hearing Plan requires written notice. No genuine issue of material fact remains that Ellerton, as the Chief of Staff responsible for making the findings to support a summary suspension, issuing the suspension, and notifying the physician, and the person who in fact took these actions in this case, violated Williams' procedural due process rights by failing to set forth in the summary suspension letter the basis for the summary suspension.

■ With respect to the three entity Defendants, the Board, UMC, and the Medical Staff, because there is no respondeat superior liability under § 1983, Williams must show some custom or policy of the entity was the driving force behind the violation or the person causing the violation had final policymaking authority. *Botello v. Gammick*, 413 F.3d 971, 978–79 (9th Cir.2005). UMC has no participation in the physician discipline process, and therefore cannot be liable to Williams for this due process violation as a matter of law. The Board's policy in the form of the

Bylaws and Fair Hearing Plan required the notice to include the missing information, and thus no policy of the Board caused the deprivation, as Ellerton failed to follow the established procedure. Although the Board conceivably could be liable by affirming the summary suspension later, Williams has presented no evidence he argued to the Board that the summary suspension violated his due process rights. Williams thus has presented no evidence that the Board ratified Ellerton's violation of Williams' due process rights related to the summary suspension. Ellerton does not have final policy making power for the Board and the Board therefore had no personal participation in the summary suspension. Thus, Williams has failed to establish that no genuine issue of material fact remains that the Board personally participated in this due process violation.

As to the Medical Staff, the Bylaws vest the summary suspension power directly in the Chief of Staff, not the Medical Staff. The Medical Staff therefore did not personally participate in the summary suspension, and thus Williams has failed to establish no genuine issue of material fact remains that the Medical Staff personally participated in this due process violation.

The Court therefore will grant Williams' motion for summary judgment on count one in relation to the summary suspension as to Defendant Ellerton. The Court will deny Williams' motion as to Defendants UMC, Medical Staff, and the Board.

ii. Drug Abuse/Wastage and the MEC Meeting

Williams argues Defendants did not provide him with adequate notice of the charges prior to the MEC's March 22 meeting because Ellerton's letter requested information related to three areas of concern, but two out of the three areas did not identify any patients or specific events, forcing Williams to guess as to which incidents were at issue. Williams also argues

Defendants provided no notice that drug-related issues would be discussed at the meeting. Defendants respond that the March 15 letter set out three areas of concern, giving Williams adequate notice to prepare for the MEC meeting. Defendants also argue Williams knew what the issues were because he prepared a detailed letter in response which was presented at the MEC meeting.

■■■ Ellerton's March 15 letter referenced the incident with WP, although it did not state with any specificity what Williams was accused of doing incorrectly. However, Williams was advised of the patient's identity and the specific incident involved. Williams was able to provide a comprehensive and detailed response as to his version of the WP incident. Consequently, a genuine issue of material fact remains as to whether Williams adequately was on notice as to the charge against him in relation to WP.

As to the Voss conversation, Ellerton's letter set out specifically what was alleged, indicating that Williams' conduct was threatening and potentially disruptive. Although Ellerton's letter referenced multiple hotline calls when there was actually only one, Williams was able to respond to the hotline call charge with a detailed response. Consequently, a genuine issue of material fact remains that Williams adequately was on notice of the charge related to the Voss hotline incident.

Ellerton's letter also referenced premature extubation of patients. However, the actual charge related to removing an ambu bag. Although Ellerton's letter perhaps was not the model of clarity resulting in Williams guessing as to which incidents might be at issue, Williams was able to make a detailed response in relation to the ambu bag incident. A genuine issue of material fact therefore remains that

Williams adequately was on notice of the charge related to the ambu bag incident.

Ellerton's letter gave no notice that any drug abuse or drug wastage policy violations would be at issue at the March 22 meeting. However, genuine issues of material fact remain as to whether the MEC based its decision to continue the summary suspension on a concern about drug abuse or drug wastage policy violations. A reasonable jury could find the referral to the Foundation was based on the three incidents outlined in Ellerton's March 15 letter, and the reference to the Foundation was for the purpose of discovering a possible explanation for the cited instances of misconduct.

Further, for the same reasons as discussed above, Williams has not established that no genuine issue of material fact remains regarding Defendants UMC's and the Medical Staff's personal participation in the notices given prior to the MEC meeting. To the extent the Medical Staff, through the MEC, personally participated in conducting the March 22 meeting, Williams presents no evidence he argued to the MEC at the March 22 meeting that it ought not to hear any charges related to drug abuse or wastage because he was not previously informed of those charges. Likewise, as discussed above, Williams presents no evidence the Board either personally participated in this conduct or later ratified it. Consequently, Williams has failed to demonstrate no genuine issue of material fact remains as to the Board's or the MEC's participation in this alleged due process violation. The Court therefore deny grant Williams' motion for summary judgment on count one regarding the March 22 meeting.

### iii. Notice Prior to the Fair Hearing/Document Requests

Williams argues Defendants did not provide him adequate notice of the charges before the Fair Hearing because the MEC's letter continuing the suspension did not state a basis for the decision, and Williams did not learn of all the issues to be presented until the Fair Hearing. Defendants do not respond specifically to this point, and argue generally that adequate notice was provided, that Williams understood the issues, and that the issues revolved around concerns about his patient care skills.

The MEC's initial decision to continue the summary suspension stated that the suspension was continued, that Williams should submit to evaluation by the Foundation, and advised him of his fair hearing rights. However, the MEC's decision did not give a reason for its decision to continue the suspension.

In subsequent correspondence to Williams' counsel, Defendants' counsel stated it was reasonable to conclude the MEC continued the suspension because of concerns related to Williams' skill or competence. But Williams is entitled to notice of the grounds for the decision, and should not have to infer from the decision what the MEC's reasons were. The Fair Hearing Plan requires that notice of the adverse recommendation must contain not only the MEC's decision, but also the ground upon which the recommendation is based.

As discussed above in relation to Ellerton's March 15 letter, a genuine issue of material fact remains as to whether Williams was on notice that certain incidents related to WP, the ambu bag, and the Voss hotline call would be addressed at the Fair Hearing. However, having never received a formal notice of charges, Williams never was informed that he was charged with drug wastage policy violations. He requested all pharmacy and Pyxis records so he could defend himself against any such charge, or for Defendants

to verify that no such records would be used against him. Defendants' counsel declined to give him any such records and neither confirmed nor denied that drug abuse or wastage issues would be addressed at the Fair Hearing.

Defendants argue drug abuse or wastage was not one of the charges, and was not a reason for Williams' suspension. But the Fair Hearing record, the Fair Hearing Committee's decision, and the MEC's confirmation of that decision make it plain that drug abuse and wastage were issues at the Fair Hearing and were bases for the suspension decisions. Pimentel testified at the Fair Hearing regarding Williams' violation of the wastage policy. Pimentel offered no testimony relevant to the other charges. In closing arguments, Ellerton specifically referenced Williams' refusal to go to the Foundation for diversion and instead getting his own drug testing which did not test for fentanyl, "the drug that was of concern in that area." (Pl.'s Mot., Ex. U at 409–10.) The Fair Hearing Committee itself indicated it heard evidence on "[w]asting of narcotics after the patient has left the room (Pyxis System Policy violation)." (Defs.' Opp'n, Ex. R.)

Further, both the Fair Hearing Committee and the MEC made specific findings regarding the drug issue. The Fair Hearing Committee found the MEC acted appropriately in suspending Williams based in part on Williams' decision not to be evaluated by the Foundation. Additionally, the Fair Hearing Committee deter-

mined that based on the wasting of narcotics incidents, "the possibility of substance abuse was a legitimate concern that needed to be addressed." (*Id.*) The Fair Hearing Committee also recommended that as a condition of keeping his privileges, Williams be required to undergo evaluation at the Foundation and agree to random drug testing. The MEC adopted these findings and recommendations. No genuine issue of material fact remains that the drug issue was a charge on which evidence actually was presented and upon which the Fair Hearing Committee and the MEC partially based their recommendations both for continuing the suspension and for the remedial plan.[8]

No genuine issue of material fact remains that Defendants failed to notify Williams that he would be facing charges related to drug abuse or wastage policy violations. Defendants not only failed to notify Williams, they declined to either confirm or deny that such evidence would be used against Williams at the Fair Hearing in response to Williams' direct inquiry regarding this very issue.

The failure to notify Williams regarding any drug related charges prior to the Fair Hearing was compounded by Defendants' refusal to provide sufficient access to documents to allow Williams to defend his property interest. Defendants refused to provide documents which Williams specifically requested, including Pyxis printouts and drug wastage reports. Despite several requests for certain documents, Defendants through their counsel refused to

8. Williams also was not provided notice that he would be charged with omitting information on his credentials application. It was not until the day of the Fair Hearing that Defendants noticed Williams that his credentials application would be an exhibit at the hearing. Defendants did not give Williams any reason why his application would be presented. It does not appear the Fair Hearing Committee or the MEC relied on any discrep- ancy in the credentials application, however. Arguably, the testimony related to the credentials application was not a separate charge, but rather was an attack on Williams' credibility. Williams therefore has failed to establish no genuine issue of material fact remains that Defendants violated his due process rights in relation to the credentials application issue.

provide documentation, asserting Pyxis reports and any documents the MEC considered were confidential. Because, as discussed above, the drug issue was an issue at the Fair Hearing, Williams was entitled to any material related to the two alleged instances of drug wastage policy violations. However, his specific request for any such material was denied.

Defendants' conduct operated to deprive Williams of a meaningful opportunity to be heard, particularly where Williams bore the burden of proof at the Fair Hearing to prove, by clear and convincing evidence, that the MEC's recommendation lacked any substantial factual basis or that the basis or the conclusions drawn therefrom were arbitrary, unreasonable, or capricious. Williams was deprived of a meaningful opportunity to meet this burden when he was not informed of all the charges against him, even when he specifically requested clarification, and was denied access to documents related to the charges which Defendants would neither confirm nor deny were being pursued.

As discussed previously, a significant private interest is at stake in proceedings to revoke a physician's privileges, and there exists a high risk of erroneous deprivation where appropriate procedures are not followed. Although there is a substantial governmental interest in ensuring quality care at public hospitals, that interest is not served by failing to identify the charges, refusing to confirm or deny what issues will be presented at the hearing, and refusing to turn over relevant documents which are related to incidents used against the physician at the hearing. The Bylaws are in accord, as they required Ellerton and the Medical Staff, through the MEC, to notify Williams of the grounds for the suspension and to provide him documentation related to incidents for which he was charged. No genuine issue of material fact remains that the failure of Defendants Ellerton and the Medical Staff to do so violated Williams' due process rights.

However, as discussed with respect to the prior incidents, UMC had no role in the suspension proceedings or the notices, and therefore Williams has failed to establish no genuine issue of material fact remains that UMC personally participated in this deprivation. Williams has presented no evidence the Board personally participated in either the inadequate notices or the decision to deny Williams access to the documents. Williams also has presented no evidence he argued to the Board that the failure to notify him regarding the drug issues and the failure to provide him documentation deprived him of due process. Williams therefore has failed to establish no genuine issue of material fact remains that the Board personally participated in this violation.

The Court therefore will grant Williams' motion for summary judgment on count one with respect to the Fair Hearing as to Defendants Ellerton and the Medical Staff. The Court will deny Plaintiffs' motion with respect to Defendants UMC and the Board.

While the Court grants Williams partial summary judgment on count one, genuine issues of material fact remain on other aspects of this count. Additionally, the parties have not addressed the question of damages or other relief to which Williams may be entitled on count one. The Court therefore will reserve these issues until trial.

## C.  HCQIA Immunity

Williams argues that because Defendants failed to provide him with due process, they are not entitled to immunity under the HCQIA. Defendants respond and cross-move, arguing that because they adequately provided due process, HCQIA immunity should apply.

The HCQIA represents Congress's effort to address on a national level the movement of incompetent physicians from state to state by providing for "effective professional peer review." 42 U.S.C. § 11101(3). To encourage participation in the peer review process, Congress granted "limited immunity from suits for money damages to participants in professional peer review actions." *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 632 (3d Cir. 1996) (citing 42 U.S.C. § 11101(5), § 11111(a)).

Under the HCQIA, if a "professional review action" meets certain procedural and fairness requirements, then the review participants "shall not be liable in damages ... with respect to the action." 42 U.S.C. § 11111(a)(1). A professional review action presumptively meets the standards necessary for immunity from damages unless the plaintiff rebuts the presumption by a preponderance of the evidence. *Id.* § 11112(a).

For HCQIA immunity to apply, Defendants must meet three requirements. *Smith v. Ricks*, 31 F.3d 1478, 1485 (9th Cir.1994). First, Defendants must comply with the fairness standards set forth in 42 U.S.C. § 11112(a). *Id.* The fairness standards in § 11112(a) provide that a professional review action must be taken:

(1) in the reasonable belief that the action was in furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a). Second, Defendants must report the results of the review action to the appropriate authorities in compliance with 42 U.S.C. §§ 11131–34. *Smith*, 31 F.3d at 1485. Third, the review action must have been commenced after the effective date of the HCQIA, November 14, 1986. *Id.*

■ Because Williams has established no genuine issue of material fact remains that he was not provided adequate notice with respect to the summary suspension and the Fair Hearing, no genuine issue of material fact remains that Williams has rebutted by a preponderance of the evidence the applicability of immunity under the HCQIA. Defendants therefore are not entitled to HCQIA immunity as a matter of law, and the Court will grant Williams' motion for summary judgment on this issue. For these same reasons, the Court will deny Defendants' Motion for Summary Judgment on the Issue of Immunity Under HCQIA (Doc. # 67).

## IV. CONCLUSION

IT IS THEREFORE ORDERED that Plaintiff's Motion for Partial Summary Judgment (Doc. # 53) is hereby GRANTED in part and DENIED in part. The motion is granted as against Defendants Ellerton and Medical Staff on count one of Plaintiff's Amended Complaint as detailed in this Order. The motion also is granted with respect to the issue of whether Defendants are entitled to immunity under the HCQIA. The motion is denied in all other respects.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment on the Issue of Immunity Under HCQIA (Doc. # 67) is hereby DENIED.